Shakman vs. United States Credit System Co.

*By the Court.*— Judgment affirmed.

---

SHAKMAN, Respondent, vs. UNITED STATES CREDIT SYSTEM COMPANY, Appellant.

*January 30 — February 18, 1896.*

(1-6) *Insurance: Indemnity against loss in trade: Power of agents: Contracts: Consent or estoppel by silence: Construction.* (7) *Corporations: Dissolution: Judgment* nunc pro tunc.

1. A contract to indemnify a merchant or manufacturer, either wholly or partially, for loss by the insolvency of customers, is a contract of insurance; and a corporation whose business is the making of such contracts is an insurance corporation, within the meaning of secs. 1977, 1978, R. S.

2. One who was an agent of such company for the purpose of soliciting insurance, transmitting applications, and collecting premiums, and who received pay therefor, was its agent for all intents and purposes, and had power to make an additional agreement that where customers were not rated by Dun's Mercantile Agency, as required in the original contract, the insured might use the ratings of Bradstreet's agency.

3. After such additional agreement had been made and indorsed upon the insurance contract, a memorandum different in terms was sent to the insured, with a request that he attach it to the contract to take the place of said indorsed agreement. The insured read the letter, but not the memorandum, and paid no attention to it and did not return it. *Held*, that his silence was not equivalent to consent to the change, and, the conduct of the company not having been in any way influenced thereby, he was not estopped to claim that the agreement as indorsed continued in force.

4. The insurance contract, though dated October 23, 1889, covered losses on goods sold during the year commencing July 1, 1889. The additional agreement, indorsed thereon November 8, 1889, and providing that "should any party to whom [the insured] *may sell goods* not be rated, within the system of this company," by Dun and be so rated by Bradstreet, the rating of the latter shall be binding, is construed as if incorporated in the contract at the proper place, and as covering all sales made between July 1, 1889, and July 1, 1890.

5. It appearing that the system of the insurance company required both a capital and a credit rating, where a customer had a credit but no capital rating in Dun's reports, and in Bradstreet's had both, the insured was entitled to use the latter.

6. The contract provided that, in calculating "losses, no credit that may have been given shall be included therein exceeding a credit of thirty per cent. on the lowest capital rating" of the debtor in the mercantile agency's books or reports. *Held*, that where the insured had given a larger credit than such thirty per cent. the excess only, and not the entire credit, should be excluded.

7. Where an action on contract against a corporation had been fully tried and submitted, and, pending the decision, the defendant forfeited its franchises and ceased to be a corporation, the judgment against it was properly entered *nunc pro tunc* as of the time when the action was submitted.

Appeal from a judgment of the circuit court for Milwaukee county: D. H. Johnson, Circuit Judge. *Affirmed.*

This is an action upon a written contract issued by defendant to plaintiff, and called a "Certificate of Guarantee." The plaintiff is a manufacturer of clothing, doing business in Milwaukee, and was such in 1889. The defendant was at that time a corporation, incorporated under the laws of the state of New Jersey. It appeared that, about the 23d day of October, 1889, the defendant's agent at Chicago, one Langsdorf, called on the plaintiff, and the plaintiff then made a written application to the defendant company for a "certificate of guarantee." This application, so far as necessary to be stated, is as follows:

"L. A. Shakman & Co. hereby apply for a guaranty of five thousand dollars of the debts of the persons to whom

we may sell goods, according to the system of said company, during the period of one year, commencing on the 1st day of July, 1889, and ending on the 1st day of July, 1890, and for that purpose we hereby make application to purchase of said company a certificate of guarantee, according to its system of credits, under the copyright of said company, for said term, and desire to enter series A of said company, which series is made up of not more than six hundred and fifty certificates, averaging a guaranty of $5,000 for each certificate. This application is made with the understanding that the said company limits its liability to pay excess losses in any one series in accordance with the following table, less the deduction allowed, to be made by said company, as the value of the bad debts sustained by the applicant, which is hereby agreed to be 12½ per cent. of the total amount of losses incurred by reason of bad debts remaining unpaid at the time of proving applicant's losses against said company."

Langsdorf forwarded this application to the company, by whom it was accepted and a "Certificate of Guarantee" returned to Langsdorf, who delivered it to *Shakman* on the 8th day of November, 1889. This certificate reads as follows:

"No. 3452.     INCORPORATED 1888.     $5,000.

"UNITED STATES CREDIT SYSTEM COMPANY, OF THE CITY OF NEWARK, N. J.

"For and in consideration of the terms and conditions herein named, and of the sum of one hundred and forty-five dollars, paid by L. A. Shakman & Co., hereby grants; bargains, and sells to the said L. A. Shakman & Co. this certificate, issued under its copyrighted system of credits, in series A, class B, for the term of one year, commencing on the 1st day of July, 1889, and ending on the 1st day of July, 1890. And for said consideration the said *United*

*States Credit System Company* guarantees, covenants, and agrees that if the said L. A. Shakman & Co. should, by reason of the insolvency of any debtor or debtors who owe such debt or debts for merchandise sold and delivered during said period, under the credit system of said company as hereinafter mentioned, or by reason of any uncollectible judgment or judgments that he or they may have obtained for the sum or sums of money due for merchandise sold and delivered as aforesaid, have losses in excess of $1\frac{3}{4}$ per cent. on their total sales made during the above limited period, to pay such excess loss, not exceeding five thousand dollars, less the deductions and subject to the terms and conditions hereinafter named.

" It is, however, expressly agreed and understood that this certificate forms a part of series A, and the company's liability to pay excess losses in any series is limited to the fund or funds provided for said series, as appears more specifically in the application signed by said L. A. Shakman & Co., which application forms a part of this certificate.

### " Terms and Conditions.

" 1. That no credit which may have been given to any party or parties shall be included in the calculation of losses, unless he or they were rated in R. G. Dun & Co.'s Mercantile Agency in the latest books or reports issued by it at the time of shipping the goods, and that no special or other report was received by said L. A. Shakman & Co. changing the same. And in case any change has occurred, such sale and shipment shall be considered to have been made in accordance with such change.

" 2. That, in calculating the losses, no credit that may have been given shall be included therein exceeding a credit of thirty per cent. on the lowest capital rating such party or parties were rated at in said Mercantile Agency's books or reports.

"3. That, in the calculation of losses, no account against any debtor shall be included therein for more than ten thousand dollars.

"4. That no credit that may have been given shall be included in the calculation of losses, unless the rating of the party to whom such credit is given was at least two thousand dollars ($2,000) at the time of shipping the goods, and that the credit rating was the best or next to the best for the capital.

"5. All losses shall remain the property of said L. A. Shakman & Co., and in consideration thereof it is agreed that $12\frac{1}{2}$ per cent. of the said $1\frac{3}{4}$ per cent. of the yearly sales, and $12\frac{1}{2}$ per cent. of the losses incurred in excess thereof, not exceeding the amount of this guaranty, shall be deducted from both said sums, and the balance, after the deduction of the amount of said $1\frac{3}{4}$ per cent. on the said yearly sales, shall be the sum for which said company is liable.

"6. That it shall be the duty of the said L. A. Shakman & Co. to notify said company of the insolvency of any of his or their debtors coming within the calculation of losses under this certificate, within ten days after receiving information of the same. Such notice shall state the name of the debtor, the place of business, date of shipment, amount thereof, and amount still due. Upon failure to give such notice, such claim shall not be taken into the calculation of losses.

"7. That, in presenting proofs of losses to said company, such proofs shall specifically show the facts upon which the guarantee bases the belief that the claims are a loss, a statement of the amount of the gross sales between and including the date of beginning and expiration of this certificate, the names of the person or persons to whom the goods were sold, itemized account of the same, date of shipment, amounts paid on account, the discounts the debtor or debtors were entitled to receive; and said proofs of loss must be duly verified.

"8. That all proofs of loss must be presented within six months after the expiration of the term mentioned and set forth in this certificate, or else the said claims shall be forever barred, even though the loss occurs on an account falling due after the expiration of said six months; provided, however, where any claim is in litigation, and notice thereof is given to the company, then, in that case, the loss, if any, shall be presented within ten days after the termination of said litigation.

"9. It is expressly understood that this certificate is issued under class B of this company, whereby the amount of the yearly sales of said L. A. Shakman & Co. are fixed between the sum of one hundred thousand dollars and two hundred thousand dollars; but, should such sales be of a greater or less sum than above fixed, then any loss sustained by the said L. A. Shakman & Co. would be settled by this company under the terms and conditions of the class to which it belongs, according to the classification system of this company.

"10. That this company shall only be liable to the said L. A. Shakman & Co. for goods, wares, and merchandise by him or them owned, shipped, and sold in the usual course of his or their business and trade, and not for goods kept by him or them on consignment and for which he or they have incurred no liability to pay for; nor shall said company be liable for claims arising from other sources.

"11. The company shall pay all losses within sixty days after the proof of loss shall have been made.

"12. There shall be no liability on the part of the company unless the said L. A. Shakman & Co. shall have continued his or their said business for the full period of the term herein mentioned and set forth, and should he or they not so continue, fifty (50) per cent. of the guaranty fee received shall be returned in full satisfaction of all claims against this company.

"Special: In condition No. 2, twenty per cent. is changed

to thirty per cent.    Condition No. 4 is changed so as to include sales to parties whose rating is K 3½ in Dun's Agency book."

At the time of the delivery of this certificate, and before payment of the consideration or premium, *Shakman* objected that the policy did not allow the use of Bradstreet's reports of ratings as well as Dun's.    There is a conflict in the evidence as to what followed this objection.    *Shakman's* evidence tends to prove that Langsdorf said he would concede this, and that he had authority to do so, and that Langsdorf thereupon wrote, and delivered with the policy, the following slip: "Milwaukee, Nov. 8, 1889.    Indorsement to certificate No. 3,452, in favor of L. A. Shakman & Co., to wit: Should any party to whom above-named firm may sell goods not be rated, within the system of this company, at Dun's Mercantile Agency, and Bradstreet's Agency does rate such party, within the system of this company, then, in such cases, the latter shall be binding upon this company.    A. LANGS-DORF, Genl. Supt."    Langsdorf, on the other hand, while admitting that *Shakman* objected to the policy because it did not allow the use of Bradstreet's ratings as well as Dun's, denies that he gave the indorsement to *Shakman* as a contract, but says that he told him he would submit the matter to the company for their decision, and that he wrote out the indorsement simply to show *Shakman* how it would read in case the company approved it.    At the same time, and after the delivery of the slip, *Shakman* paid to Langsdorf the premium of $155.

It appeared that one Fishell was the partner of Langsdorf, and that their office was at Chicago, and that they styled it the "Western Department" of the *United States Credit Company;* Langsdorf calling himself general superintendent, and Fishell general manager.    Langsdorf testifies that they assumed these titles without authority of the company, and really only had authority to solicit business

and collect premiums. On or about November 26, 1889, the plaintiff received a letter from Fishell as follows: "Inclosed find indorsement slip, as requested, which please attach to the certificate, to take the place of the agreement left with you signed by our Mr. Langsdorf. Very respectfully, ALBERT FISHELL, Mgr." The slip inclosed reads as follows: "Should Dun's Mercantile Agency not rate a party, and Bradstreet's Agency should give such party a rating or report, and such rating or report is sufficient to be covered by the system of this company, then and in that case the said L. A. Shakman & Co. may use Bradstreet's Mercantile Agency as a basis for such party. This special permission to take effect November 13, 1889. [Signed] FRED M. WHEELER, Secretary." The plaintiff read the letter, but not the slip, and paid no attention to it, and did not return it.

The action was tried by the court, jury being waived, and the court made findings of fact substantially as above stated. As to the disputed questions with regard to the Langsdorf indorsement of date November 8th, the court found favorably to the plaintiff's contention, and that it became a part of the contract on that day. The court further found that the plaintiff, during the period covered by the contract, suffered losses within its terms, amounting, in the aggregate, to $6,502.47, and that, after deducting therefrom 12½ per cent. of such total, and 1¾ per cent. of the plaintiff's total sales, the net losses covered by the contract were $2,856.75. Due notice and proof of loss were also found, and the court found, as matter of law, that the defendant is an insurance corporation, and that the contract in question is a contract of insurance. Judgment for the plaintiff for $2,856.75, with interest and costs, was rendered, and the defendant appealed.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *E. P. Vilas.*

For the respondent there was a brief by *Bloodgood, Blood-*

*good & Kemper*, attorneys, and *Jackson B. Kemper*, of counsel, and oral argument by *W. J. Turner.* To the point that the defendant was an insurance company, they cited 11 Am. & Eng. Ency. of Law, 280; 1 May, Ins. § 1; *Lucena v. Craufurd*, 2 Bos. & P. (N. R.), 300; *State ex rel. Att'y Gen. v. Farmers & M. M. B. Asso.* 18 Neb. 276; *Robertson v. U. S. C. S. Co.* 57 N. J. Law, 12.

WINSLOW, J.  We regard the contract before us as unquestionably a contract of insurance.  An insurance contract is a contract whereby one party agrees to wholly or partially indemnify another for loss or damage which he may suffer from a specified peril.  The peril of loss by the insolvency of customers is just as definite and real a peril to a merchant or manufacturer as the peril of loss by accident, fire, lightning, or tornado, and is, in fact, much more frequent.  No reason is perceived why a contract of indemnification against this ever-present peril is not just as legitimately a contract of insurance as a contract which indemnifies against the more familiar, but less frequent, peril by fire. This very contract has been (*sub silentio*) construed as a policy of insurance by the supreme court of New Jersey. *Robertson v. U. S. C. S. Co.* 57 N. J. Law, 12.

The contract being, then, a contract of insurance, and the defendant's business being the making of such contracts, it follows that the defendant is an insurance corporation, within the meaning of secs. 1977, 1978, R. S.  Langsdorf was its agent for the purpose of soliciting insurance, transmitting applications, and collecting premiums, and received pay therefor.  He was, consequently, under sec. 1977, *supra*, its agent for all intents and purposes, and had power to make the additional agreement contained in the indorsement dated November 8th.  *Renier v. Dwelling House Ins. Co.* 74 Wis. 89.  The court has found, on ample evidence, that he did make that agreement, and the fact is therefore

settled.   It is, then, a fact in the case that a complete con-
tract of insurance was made, on or about November 8th, by
the terms of which the plaintiff was to have the right to use
the Bradstreet's ratings in case a given customer was given
no rating by Dun.

But it is said that the memorandum sent to the plaintiff
November 26th, which permitted the use of Bradstreet's re-
ports *only after November 13th, 1889,* became effective and
binding by reason of the plaintiff's receiving it and failing
to object thereto.   We are unable to agree with this con-
tention.   The agreement of November 8th, being perfect,
the letter and inclosed memorandum of November 26th
could, at the most, amount to nothing more than a proposal
to change the terms of the existing contract.   This the
plaintiff could do or not, as he chose; but it cannot be said
that he did so unless he expressly agreed to the change,
or unless his silence was legally equivalent to an express
consent to the proposed change.   There was no express
agreement to make the change, nor do we think that the
simple failure to answer the proposal should be construed
as such an agreement, in the absence of all evidence show-
ing that the defendant was influenced in its conduct by
plaintiff's silence.   An agreement inferred from silence must,
in such case, rest on the principle of estoppel; and one es-
sential element of estoppel is lacking here, namely, a change
of position on the part of the defendant, relying on the
plaintiff's silence, which would result in substantial injury
to the defendant were it not permitted to rely on the estop-
pel.   The conclusion necessarily is that the contract which
became perfected, November 8th, with the Langsdorf in-
dorsement, became the contract governing the rights of the
parties.

Another question now arises upon the construction to be
given to the Langsdorf indorsement.   It will be noticed
that the policy, though dated October 23, 1889, in terms

covers the period of one year commencing on the 1st of July,. 1889, and that it insures against losses accruing for merchandise sold and delivered during that period. Thus, the contract covers several months' business transactions previous to its date. It appears in evidence that a considerable number of the losses for which the plaintiff has recovered judgment were suffered between July 1, 1889, and the delivery of the contract, and that these losses arose from credits given to parties who had no credit rating in Dun's reports, but did have such rating in Bradstreet's reports. It is now contended that the Langsdorf indorsement is purely prospective in its operation, and only insures losses occurring after November 8th; so that, for the losses occurring before that date, covered by Bradstreet's reports only, there can be no recovery. The indorsement reads: "Should any party to whom above-named firm *may sell goods* not be rated,. within the system of this company, at Dun's Mercantile Agency," etc. The argument cannot prevail. This indorsement is part of the whole contract. It must be read in connection with all the other provisions of the contract, and as though it were incorporated in the contract at the proper place. So read, there can be no doubt that the contract refers to all goods sold and credits given between July, 1889,. and July, 1890, and that the right to use the Bradstreet. ratings in the proper cases was intended to be as broad in its terms as to time as the right to use the Dun ratings.

Subdivision 2 of the terms and conditions of the policy provides that, in calculating "losses, no credit that may have been given shall be included therein exceeding a credit of thirty per cent. on the lowest capital rating such party or parties were rated at in said Mercantile Agency's books or reports." In a number of instances of losses the plaintiff had given the insolvent debtors a larger credit than thirty per cent. of their lowest capital rating. The court allowed, in. such cases, thirty per cent. of such rating, and disallowed.

the excess. It is claimed by appellant that the clause means. that the entire *credit* is to be excluded, and not simply the excess above thirty per cent. of the rating. This is purely a matter of construction of language, and our construction agrees with that of the trial court, namely, that it is only that part of the credit exceeding thirty per cent. of the rating which is to be excluded.

It is claimed that a loss of $300 suffered by the failure of one Simansky was improperly allowed. It appears that. Simansky's name appears in Dun's reports with the notation "Blank 3;" that is, no capital rating, and credit "fair." In Bradstreet's reports, however, he appears rated "X D," which means $1,000 to $2,000 capital, credit fair. It seems. to us that this loss was properly allowed. Simansky had no capital rating in Dun's reports. The system of the defend- ant required both a capital and a credit rating. This was, therefore, a case clearly within the Langsdorf indorsement, where the party was not "rated, within the system of the company, at Dun's Agency," and was so rated in Bradstreet's. Agency.

This case was tried and submitted to the court February 20, 1894, and taken under advisement by the court, and held under advisement until October of the same year. The original findings were signed and filed October 2d, and, on motion of defendant, were amended in some particulars on the 27th day of October, on which day the appellant's attor- neys made proof to the court that, on the 2d day of October, the court of chancery of New Jersey had by decree declared that the defendant had ceased to be a corporation and had forfeited its franchises and rights under the laws of New Jer- sey, and appellant's attorneys objected to the entry of judg- ment for that reason. Thereupon the court ordered the find- ings to be dated and filed as of March 3d, so as to bring them within the term at which the case was tried, and also ren- dered judgment *nunc pro tunc* as of that day. This was right.

The action was upon contract. Where such an action has been fully tried and submitted and taken under advisement by the court, and, pending the decision, a party dies, the court will not allow the action to abate, but will enter judgment as of the time when the action was submitted. The judgment forfeiting the franchises of the corporation could amount to nothing more than the death of an individual. 1 Black, Judgm. § 127; *Mitchell v. Overman,* 103 U. S. 62.

By the Court.— Judgment affirmed.