## STATE *vs.* C. N. HOGAN.

Opinion filed May 5, 1899.

**Insurance Agent—Certificate of Authority.**

> A violation of the provisions of section 3124, Rev. Codes, forbidding any agent to act for any insurance company in transacting the business of insurance without procuring a certificate of authority as therein specified, is a crime under the laws of this state.

**What Constitutes an Insurance Company.**

> A corporation which undertakes to guaranty a fixed revenue per acre from farming lands, and which, in order to do so, contracts, for a specified consideration, to pay such fixed amount per acre for the crop grown upon said land, irrespective of its value, is an insurance company within the provisions of sections 4441, 4445, Rev. Codes.

C. N. Hogan being in the custody of J. G. McKecknie, sheriff of Foster county, upon a commitment issued after a preliminary examination by a committing magistrate of said county, petitioned for a writ of habeas corpus, alleging that he is illegally restrained. The defendant demurred to the petition. The allegations of the petition appear in the Court's opinion.

Writ denied.

*W. E. Purcell, P. J. McCumber, Charles E. Wolfe,* and *Stevens & Allen,* for petitioner.

*John F. Cowan,* Attorney General, and *George W. Soliday,* State's Attorney, for the State.

BARTHOLOMEW, C. J. One C. N. Hogan presented to this Court his petition for a writ of habeas corpus, alleging that he was unlawfully restrained of his liberty by the sheriff of Foster county, in this state. His petition sets forth that he was arrested upon a warrant issued by a justice of the peace of said county, which said warrant was based upon a complaint duly laid before said justice by one Ferguson, wherein said petitioner was accused of having acted as agent for an insurance company without having procured the certificate required by section 3124 Rev. Codes of this state, that a preliminary hearing was duly had before said justice, and that upon such hearing said justice adjudged that the petitioner be held to answer to said charge before the District Court of said county, and fixed his appearance bond at the sum of $500, which the petitioner failed to give, whereupon he was duly committed to the custody of said sheriff, and was by him restrained. Copies of the complaint, the warrant, of all the testimony introduced at the hearing, of the entries in the docket of the justice and of the mittimus were attached to, and made a part of, the petition. The writ was duly issued by this Court, directed to said sheriff, who

in due time made return thereto setting forth the grounds upon which he restrained the petitioner, which were substantially in all respects as shown in the petition. To this return the petitioner demurred, and upon the issues of law thus raised the case was argued to this Court.

The petitioner contends (1) that a violation of the provisions of said section 3124 does not constitute a crime, under the laws of this state, and, (2) granting that such violation does constitute a crime, there is no reasonable or probable cause to believe that petitioner has committed such crime We notice the points in this order.

Section 3124, Rev. Codes, declares: "No agent shall act for any insurance company directly or indirectly in taking risks or transacting business of insurance without procuring from the commissioner of insurance a certificate of authority, stating that such corporation or company has complied with all the requisites of this chapter. Section 3131, being a part of the same chapter, declares: "For violation of any provision of this chapter when no penalty is specifically provided for herein the offender shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars." We notice here that the fine imposed is declared to be by way of punishment, and a large discretion is vested in the court in fixing the amount. No part of the amount inures to the benefit of any private person. No person is authorized to sue for or recover it. It is not a case where the law arbitrarily fixes a penalty as the liquidated damages for failure to perform an ascertained legal duty owing to another, and which penalty the party to whom the duty was owing may recover in a personal action upon proof of the dereliction. But petitioner urges that this penalty should be recovered by the state under the provisions of chapter 27, Code Civ. Proc., which relates to actions to recover penalties and forfeitures. But the first section of that chapter (section 5785) provides that, if the act for which the forfeiture was imposed is a misdemeanor, then such forfeiture cannot be recovered in a civil action. We look then to the Penal Code to determine whether or not this act is a misdemeanor. Section 6802 reads: "A crime or public offense is an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed, upon conviction, either of the following punishments: * * *" And the third punishment named is "fine." We have then, in this case, a statute (section 3124) forbidding the doing of a certain act, we have that forbidden act done, and the punishment which the law (section 3131) prescribes for doing this forbidden act is a fine; hence it must be a crime. Section 6803 declares that crimes are divided into felonies and misdemeanors. Section 6804 reads: "A felony is a crime which is or may be punishable with death or imprisonment in the penitentiary; every other crime is a misdemeanor." We have here, then, a crime. It cannot be punished by death or imprisonment; hence it must be a misdemeanor. It seems clear to us that petitioner's first contention cannot prevail. In saying that this offense cannot be

punished by imprisonment, we mean only that primarily the judgment must be a fine, and the judgment may be satisfied by the payment of the fine; but we do not hold that the judgment may not also direct that, in case of nonpayment, the defendant be imprisoned as provided in section 8295, Rev. Codes.

Petitioner's second proposition presents more difficulties, and, as preparatory to its discussion, we remark that no point is made by petitioner as to the regularity of any of the proceedings that led up to his incarceration. They are concededly regular. It is admitted, also, that petitioner was soliciting business as agent for a corporation known as the Realty Revenue Guaranty Company, of Minneapolis, Minn. It is admitted that petitioner never procured the certificate of authority specified in said section 3124, and that he took an application from the complaining witness in form as set forth in the evidence, and procured for said witness the contract of said company as set out in the evidence, and took the promissory note of the witness, secured by chattel mortgage, for the consideration mentioned in said contract. These admissions leave but one question for our determination: Is or is not the Realty Revenue Guaranty Company, in fact or in effect, an insurance company? If it be, then clearly the petitioner was properly held; otherwise, he should be discharged. While the attorneys representing the state claim that the oral evidence in the record strengthens their claim that said corporation is in fact an insurance company, yet we shall rest our conclusions on this point upon the documentary evidence. Our statute (section 4441, Rev. Codes) defines insurance as follows: "Insurance is a contract whereby one undertakes to indemnify another against loss, damage or liability arising from an unknown or contingent event." Necessarily, in defining insurance in a single sentence, only the most general terms can be used, and any general definition must be extended to cover the ever-changing phases in which the subject is presented to the public. Fifty years ago it was thought that a single chapter in any work on contracts could exhaust the law of insurance. Now Mr. Joyce presents the subject in four elaborate volumes, showing the immense development of that branch of the law. Mr. Joyce expressly defines one line of insurance as guaranty insurance. See 1 Joyce, Ins. § § 12, 13. True, guaranty insurance, as there defined, relates more particularly to guaranty against loss by reason of breaches of contract, such as "fidelity guaranty" and "credit guaranty." But we have real estate title guaranty insurance; and, while perhaps this is the first instance where an attempt has been made to guaranty a realty revenue, yet as the revenue arising from that class of realty here involved, *i. e.* farming lands, is affected by so many contingencies, such as winds, hail, frost, drought, ravages of insects, etc.,—contingencies which, while not likely to happen, yet such as may occur,—it would seem that inherently it would be a proper subject for insurance, perhaps even an inviting field. In this record we find a copy of the articles of incorporation of the Realty Revenue Guaranty Company. The

second article sets forth the general business of the corporation, naming a number of things that it is organized for the purpose of doing, and, among others, "to guaranty certain rental and produce income from lands and tenements." The petitioner, as agent for said company, took from Peter Ferguson an application for a contract. The application was upon a printed form, headed, in bold type, "Realty Revenue Guaranty Company, of Minneapolis, Minn. Capital stock $100,000." Then follows the printed portion, which reads: "I, ——, of —— P. O., county of ——, state of ——, do hereby apply to the Realty Revenue Guaranty Company for an option-sale contract of $—— per acre, which is hereby referred to and made a part hereof, subject to all conditions therein contained upon all crops raised on the following described lands." Then follows a description of land, and various questions to be answered by the applicant as to whether he is owner or tenant of the land, and what interest he has in the crop, what the land yielded per acre the year before, nature of the soil, etc.,—all to be signed by the applicant. Upon this application, Ferguson received a contract, which we copy in full: "This agreement, made by and between the Realty Revenue Guaranty Company, of Minneapolis, Minnesota, and Peter Ferguson, of Carrington P. O., County of Foster, and State of North Dakota, party of the second part, witnesseth that, in consideration of an application for this contract, which is hereby referred to and made a part hereof, and the payment of the sum of $55, according to the conditions of a certain promissory note for said amount, by said party of the second part, the above named Realty Revenue Guaranty Company agrees to purchase the entire crop of small grain, consisting of wheat, oats, flax, barley, corn, or rye, from said party of the second part, at the rate of $5.00 per acre, grown during the season of 1899; all of said crops being on the following described lands, to-wit: 160 acres southeast quarter of Sec. 20, T. 146, R. 65; 60 acres northwest quarter Sec. 26, T. 146, R. 65. It is further agreed that said party of the second part is in no manner bound to sell said crops to the said Realty Revenue Guaranty Company, except at his own option. It is further agreed that said party of the second part shall cultivate said crops in a husbandlike manner, sow, plant, garner, gather, harvest, thresh, and otherwise care for said crops in due season and in an economical manner. Said party of the second part agrees to notify said Realty Revenue Guaranty Company in case of any damage to said crops within five days thereafter, and of his intention to avail himself of his option to sell before said crops are harvested, and shall, within five days after threshing the same, give notice to the company of his election to sell under this contract After said election to sell, said party of the second part agrees to deliver said crops at the nearest market, if directed so to do by said Realty Revenue Guaranty Company. Should the party of the second part fail to perform any of the conditions herein by him to be performed, time being the essence hereof, or if any of the warranties or statements made by him are untrue,

the said option shall terminate. Nor shall said guaranty company be liable under this contract should any damage or loss accrue to said crops after September 15 of this year, or after said crops are harvested, nor in any manner, except as herein stipulated. This contract shall terminate December 1st following date hereof. In witness whereof, the said Realty Revenue Guaranty Company has caused these presents to be executed and signed by its president and secretary, and caused its corporate seal to be hereto attached, this seventh day of April, 1899. Realty Revenue Guaranty Co., by L. E. Utley, President. A. L. Brice, Secretary. [Corporate Seal.]"

What was the object of this contract and what was its legal effect? The petitioner says it was an option contract of sale of a crop. We cannot conceive that the farmer's primary object was to sell his crop. Ordinarily a man does not pay a premium for the privilege of selling his produce. Nor was it the primary purpose of the company to purchase the crop. From the very terms of the contract, it is certain that it must lose money upon all the grain it buys under the contract. Moreover, grain is bought and sold by the bushel, and not by the acre. We think the contract was the identical contract which the articles of incorporation authorize the company to enter into. It was a contract by which the guarantor undertook to guaranty or assure to the farmer a certain revenue from his land. How did the parties proceed to execute such a contract? It was well known to both parties that an acre of land in this state, farmed as the farmer contracts to farm it in this case, will produce a crop of a value far in excess of five dollars, and the value can be reduced to or below that figure only by the happening of one or more of the contingencies hereinbefore mentioned. But such contingencies may happen, and to be absolutely assured that his land will yield him at least five dollars per acre the farmer is willing to pay something; and the corporation, expecting to do business over a wide scope of country, believes that it can with profit to itself assure the farmer a crop worth five dollars per acre for the compensation which the farmer is willing to pay therefor. But what is this in substance except a contract to indemnify the farmer against loss arising from the happening of a contingent event, and that is our statutory definition of insurance. The farmer was seeking and paying for protection, and the corporation was seeking to make a profit by extending this protection for the consideration paid by the farmer. True, it is not all loss that is insured against. The contingencies named may reduce the value of a crop from twenty dollars per acre until, in the judgment of the owner, it barely exceeds five dollars per acre, and there is no liability under the contract. It is the loss below five dollars per acre that is insured against. The effect of the contract is very like that of a valued policy of insurance. When the contingency happens that creates a liability under the policy, then the full amount of the policy must be paid, but the insured is entitled to all the salvage.

N. D. R.—20

In *Claflin* v. *System Co.,* 165 Mass. 501, 43 N. E. Rep. 293, the defendant was held to be an insurance company. The contract is thus stated by the Court: "It was made on April 6, 1891, and purports to bind the defendant, in consideration of a sum paid, to purchase at a fixed price the accounts which during one year a certain business firm should have against ascertained insolvent debtors, or judgment debtors against whom execution should be returned unsatisfied." A contract to purchase bad accounts and judgments at a fixed price, irrespective of value, cannot be distinguished in principle from a contract to purchase damaged crops at a fixed price, irrespective of value. That same company was held to be an insurance company in *Shakman* v. *Same,* 92 Wis. 366, 66 N. W. Rep. 528, and the resoning of the Court is very pertinent to this case.

It is doubtless true that there has been a studied effort to keep this corporation outside the operation of our insurance laws; but the purpose and effects of its contracts are too clear to admit of doubt. They exactly meet the requirements of an insurance contract, and the corporation for which petitioner acted as agent is an insurance company. The act charged in the complaint is a crime under our statutes, and there is reasonable and probable cause to believe the petitioner guilty of committing the act. He is therefore properly held.

The writ issued in this case is discharged, and petitioner remanded to the custody of the sheriff of Foster county. All concur.

(58 N. W. Rep. 1051.)

Note—Habeas Corpus case must be brought in the name of the state. Carruth v. Taylor, 8 N. D. 166.