STATE EX REL. MARTIN, Attorney General, Respondent, vs. DANE COUNTY MUTUAL BENEFIT ASSOCIATION, Appellant.

*May 16—June 15, 1945.*

For the appellant the cause was submitted on the brief of *Hill, Beckwith & Harrington* of Madison.

For the respondent there was a brief by the *Attorney General* and *W. E. Torkelson,* assistant attorney general, and oral argument by *Mr. Torkelson.*

MARTIN, J. This appeal presents two questions: (1) Whether or not the articles of incorporation of the defendant corporation show that its business and purpose is to engage in the business of insurance; (2) whether or not the manner in which said corporation actually did and now operates establishes that it has and now is engaged in such business. The court below answered both questions in the affirmative.

There is no material dispute as to the facts. On March 27, 1931, defendant was organized as a nonstock, nonprofit corporation under ch. 180, Stats. Its original articles were filed with the secretary of state and the register of deeds of Dane county, and a certificate of incorporation issued. Art. (1) of the articles of incorporation provides that defendant was organized as a mutual benefit association. It further provides:

"The undersigned have associated, and do hereby associate themselves together for the purpose of forming a corporation under chapter 180 of the Wisconsin statutes, the business and

purpose of which corporation shall be (1) to establish a membership of men and women, in three-age classes, who agree to and with each other, each to pay within thirty days after the notice of death of any member in his or her class, the sum of $1.10; (2) to mail notices of the death of any member and to receive all moneys paid in; (3) to pay to the beneficiary of the deceased member one dollar out of every $1.10 received and to pay to the secretary the remaining ten cents to cover the expense of assessment. *This corporation is organized exclusively for benevolent purposes and there is no insurance feature connected with it."*

Art. (3) provides:

"The corporation shall be nonstock and no dividends or pecuniary profits shall be declared to the members thereof."

Art. (8) provides:

"The methods and conditions upon which members shall be accepted and discharged or expelled shall be as follows:

"Any white man or woman of good moral character and good general health, and between the ages of fifteen and sixty-five years, inclusive, who, in the opinion of the secretary, is a desirable risk, is eligible to membership in this association. The secretary shall have exclusive power and right to accept or reject any application for membership.

"Membership shall be in three separate and distinct classes, to wit: Class 'A,' Class 'B,' and Class 'C.'

"Class 'A' shall consist of members between the ages of fifteen and twenty-five years inclusive, Class 'B' shall consist of members between the ages of twenty-six and fifty years inclusive, and Class 'C' shall consist of members between the ages of fifty-one and sixty-five years inclusive.

"Membership in this association shall be limited to two thousand members in each of the three classes, but further classes may be formed whenever it is deemed advisable by the board of directors.

"All applications for membership must be accompanied by the following fees: Three dollars shall be the entrance fee for a single membership or two dollars and fifty cents for each member when more than one from the same family make ap-

plication at the same time, which fee or fees will be returned in case the application or applications is or are rejected.

"Upon the acceptance by the secretary of the application of any person for membership, there shall be issued to him a membership card designating to which class of membership the applicant has been admitted.

"Each member of this association shall pay the sum of one dollar ten cents within thirty days after the nqtice of death of another member has been mailed to the last address appearing on the records of the secretary of this association. Any member who shall fail to remit or pay such assessment within the time specified on the notice mailed to him shall cease to have any rights to the benefits of this association.

"No more than one membership in this association may be held by any person, in any one class.

"Any member may change his or her beneficiary as shown upon the application by a request in writing to the secretary, providing such request is signed by the member and witnessed by two persons not related to such member.

"Any false statement or statements made by the applicant on the application for membership will render the membership null and void."

In June, 1931, two additional classes were formed, consisting of the Junior and Senior classes. The former class embraced members from the ages of three to fourteen years, inclusive; and the latter, those from the ages of sixty-six to seventy-five years, inclusive. The Junior and Senior classes were limited to five hundred members each. The Junior class was discontinued on January 14, 1942. Shortly after the certificate of incorporation was issued the defendant started to operate and do business as a corporation organized under ch. 180, Stats. The entrance fee paid by applicants for membership is paid to the person securing the new member. The application is in writing and contains, among others, the following questions to be answered by the applicant:

"Are you in good health? ——— Have you consulted a doctor for any ailment in the last two years? ——— If so,

for what cause? ——— Doctor's name ——— Address

"Have you ever had any disease of the heart, kidneys or lungs, or high blood pressure?"

The application contains the following:

"G. That failure to pay assessments pursuant to notice given shall terminate my membership in said class.

"H. That my membership herein becomes effective if and when this application is received and my membership certificate issued by the secretary.

"I. That upon the death of a member of this class one per cent of the amount payable to the beneficiary shall be deducted and placed in a fund to be expended as directed by the board of directors."

As of January 1, 1944, the association had a membership in the several classes as follows: Class 'A,' 774; Class 'B,' 1,454; Class 'C,' 654; Senior class, 161. The Junior class on January 1, 1942, had a membership of 161. The number of claims paid out by the association in the several classes up to January 1, 1944, are as follows: Junior class, 2 claims; amount paid, $238; Class 'A,' 7 claims; amount paid, $3,698; Class 'B,' 92 claims; amount paid, $117,871; Class 'C,' 173 claims; amount paid, $113,529; Senior class, 112 claims; amount paid, $27,750. Total claims, 398; total amount paid out, $263,086.

The corporation has from time to time since its organization made reports to its members, illustrative of which are the following:

Report of March 20, 1934, states that from its organization to January 1, 1934, it had paid death claims totaling $53,992. Average rate per $1,000 per year is calculated and the report states:

"Low cost of protection:

"From the above figures we calculate the rate per $1,000 per year, since our organization to January 1, 1934, to be as follows:

"Junior Class, nothing; 'A,' $2.83; 'B,' $5.06, and 'C,' $16.47. We give you these figures so that·you can compare them with rates quoted by the insurance companies."

This report further states:

"We solicit your co-operation in spreading confidence among your friends and neighbors with the idea in mind that they will soon be induced to enroll, thereby increasing your protection and securing for themselves, 'Life Protection At Cost.'"

In a report made January 28, 1935, there is the following statement:

"Nowhere in the world, we believe, can life protection be secured at a lower cost."

In a report on January 11, 1938, after stating the amounts received by beneficiaries of deceased members, is the following:

"Now, compare the protection you have and the cost, with that of any form of life insurance you can find at your age. . . .
"This is your association and its success or failure will depend, in a measure, upon you. If you pay your assessments promptly and use your efforts to counteract the publicity being spread by uninformed life insurance agents and to recommend it to your friends as the least expensive form of life protection they can have there will be no reason to doubt its value."

The report of January 7, 1939, states that care must be exercised in an attempt to increase the membership as there is no value in adding "substandard risks." Also, a member's "protection" ceases if an assessment is not paid by the date specified in the notice.

The report of January 4, 1941, states that the European war has stimulated the alert people of America to new heights of interest in "securing protection for their families in case of

their death," and that members of this association had made it possible for some of their families to receive this help.

In the report of January 3, 1944, members are asked to use their influence in securing new members. This report contains the following statement:

"Even at this rate the cost has been small for these ages [Class "C" members] compared with any old-line company."

It is alleged that defendant has failed at all times since its organization to do any of the following things: (a) That it has never maintained any reserve for payment of benefits to members except such amounts as might be collected from members by way of assessments and a fund created by deduction of one per cent of the amount payable to each beneficiary to build up a fund to make advance payments on death benefits in advance of the levying of an assessment; (b) that it has never filed or attempted to file articles of incorporation or by-laws with the insurance commissioner of Wisconsin; (c) that it has never paid into the state treasury any sum as an annual license fee or otherwise; (d) that it has never received a license authorizing it to transact the business of life insurance or any other insurance from the insurance commissioner of Wisconsin; (e) that it has never filed with the insurance commissioner any report of any kind or any statement (sworn or otherwise) concerning its affairs or business or containing a statement of expense·charges and expenses of business; (f) that it has never filed a form of policy or a table of rates or a statement of benefits furnished to agents or to the public with the insurance commissioner; (g) the insurance commissioner has never approved any policy or form of policy issued by such association.

All the foregoing facts are alleged in the complaint and supplemented by affidavit filed in support of plaintiff's motion for a summary judgment. All material facts are admitted by defendant's answer. Defendant denies that by reason of the

facts alleged it engaged, or that it is engaged, in the business of insurance. It further alleges that it is a nonprofit organization and acts merely as a collection agency for its members; that the association does not agree to pay any specific sum to the beneficiary of a deceased member; that it merely agrees to levy an assessment on its members and to pay over to the beneficiary named the amount it collects less the deductions hereinbefore mentioned. If the defendant is engaged in the insurance business, it is in violation of the provisions of ch. 180, Stats., under which it organized. Sec. 180.01 provides:

"Three or more adult residents of this state may form a corporation in the manner provided in this chapter for any lawful business or purpose whatever, except banking, *insurance* and building or operating public railroads, but subject always to provisions elsewhere in the statutes relating to the organization of specified kinds or classes of corporations."

The articles of incorporation may not contain any provision inconsistent with the law. Sec. 180.02 (1) (h), Stats.

The respondent contends that defendant's articles of organization and the plan under which it has operated and is now operating is an assessment form of insurance. In Riegel and Loman, Insurance Principles and Practices (1942), p. 218, the authors state:

"The earliest assessment plan was where each and every member was assessed a flat amount, so that the total collected was just sufficient to meet current costs, collections being made each time a member died."

In Vance, Insurance (2d ed.), p. 53, the author states:

"Pure assessment insurance requires that the loss that may be suffered in the case of the death of any person in the class insured shall be met by levying a proportionate assessment upon all of the surviving members of that class, with such additional amount as may be necessary to defray the expenses of administration."

At pp. 83, 84 the author states:

"A very considerable part of the life insurance carried by the workmen of the United States as well as of England is provided by mutual benefit associations, called 'Friendly Societies' in England, and usually known as 'Fraternal Beneficiary Associations' in this country. . . .

"For quite an extended period the insurance activities of benefit societies were conducted on the assessment plan. . . .

"While the provision made by these benefit associations for paying sick and death benefits is essentially a contract of insurance, and therefore subject in general to the same rules of law as apply in other similar contracts, yet such associations are usually given a different standing from the old-line companies by special statutes that are enacted in their favor. . . ."

A plan whereby on the death of a member an equal or flat assessment is levied on all members, irrespective of age, for the purpose of creating a fund to be paid to the beneficiary of such deceased member, has uniformly been recognized by all writers and authors on the subject as constituting a form of life insurance. Dawson, Assessment Life Insurance (1896), p. 1 et seq.; Huebner, Life Insurance (1919), p. 271 et seq.; MacLean, Life Insurance (1939), pp. 7, 530; Riegel and Loman, Insurance Principles and Practices (1942), p. 218. That such form of protection constitutes insurance, see *Penn Mut. Life Ins. Co. v. Lederer* (1919), 252 U. S. 523, 531, 40 Sup. Ct. 397, 64 L. Ed. 698. The court there said:

"All life insurance has in it the element of protection. That afforded by fraternal beneficiary societies, as originally devised, had in it only the element of protection. . . ."

In *Ellison v. Straw,* 119 Wis. 502, 508, 97 N. W. 168, the court said:

"Pure life insurance has become rare, except with beneficial associations."

Under secs. 1953*b* and 1953*c*, Sanborn & Berryman's Anno. Stats. 1889, certain named benevolent societies under certain circumstances were not deemed life insurance companies within the meaning of the general insurance statutes. But those sections were repealed by the act revising the statutes, effective September 1, 1898.

In *Eastman v. Provident Mutual Relief Asso.* 62 N. H. 555, 556, the association was organized for charitable and benevolent purposes. These purposes, as described in their charter, were the "furnishing relief and assistance by means of mutual agreements and payments of funds." Their object was more particularly defined in their by-laws to be "to secure to dependent and loved ones assistance and relief at the death of a member." They resorted to assessments for the procurement of the funds to discharge their mutual obligations, and were governed by by-laws which limited and defined those obligations. The court said:

"Such associations for the general purpose of mutual protection resemble life insurance companies, *and are life insurance companies in substance.*" Citing cases.

In *Smith v. Bullard,* 61 N. H. 381, the Odd Fellows Mutual Relief Association was organized for the purpose of defraying the expenses of the sickness and burial of its deceased members and of rendering pecuniary aid to the families of such deceased members or their heirs. Applications for membership stated the name, age, residence, health, and occupation of the applicant, the name of the lodge of which he was a member, and designated the person or persons to whom the aid derived from his membership should be payable. The applicant received a membership certificate. The sum paid on admission was measurably proportioned to the age of the applicant. Upon the death of a member each surviving member was assessed $1.10, and the amount collected under those provisions was the relief fund of the corporation and the fund

from which the corporation expenses were paid. When a member died a sum equal to as many dollars as there were surviving members was paid to the person or persons designated in the application for membership. The court held that the contract of the members of a mutual relief association by which, on the death of a member, the sum of $1 assessed on each survivor is due to an appointee of the deceased, being one of his heirs or a member of his family, is a contract of life insurance within the Gen. Laws, ch. 175.

Appellant argues that the business of the defendant does not fall within the recognized definition of insurance, and that sec. 206.55, Stats., defines insurance. This is not a statutory definition of life insurance. It is a prohibitory statute and prohibits any company from engaging in the insurance business in the state without complying with its statutes. Sec. 206.55 was formerly sec. 209.11. By a revisor's bill enacted in 1933 it was revised and renumbered as sec. 206.55. It formerly read in part as follows (Sec. 209.11, Stats. 1931):

*"All insurers to comply with law.* No corporation, association, partnership or individual shall do any business of insurance of any kind, . . . in this state or with any resident of this state except according to the conditions and restrictions of these statutes. And the term 'insurance corporation' as used in this chapter may be taken to embrace every corporation, association, partnership or individual engaging in any such business."

In a note at the beginning of the revisor's bill (Bill No. 50, S., session 1933) it is said that the absence of any note at the end of a section of the bill indicated that the section made no change in the law. There is no note following sec. 245a of that bill, which revised and renumbered sec. 209.11, Stats. 1931. It must be considered that the law as contained in present sec. 206.55 is the same as it appeared in sec. 209.11, Stats. 1931. See sec. 370.01 (49), Stats. 1943.

Appellant quotes from *Ellison v. Straw, supra,* p. 508, as follows:

"Life insurance is a promise to pay a certain sum upon the death of the assured."

The case should not be decided on the basis of definitions of the word "insurance." It is not apparent that the court in *Ellison v. Straw, supra,* intended an all-inclusive definition of the word "insurance." We must examine all the facts and determine the real nature and substance of the activities carried on by defendant to determine whether the business for which it was formed and actually carried on constitutes a form of insurance. As said by the New York court of appeals in *People v. Roschli,* 275 N. Y. 26, 29, 9 N. E. (2d) 763:

"What is in substance a contract of insurance cannot be changed into something else by giving it another name."

In *Northwestern Mutual Life Insurance Co. v. Murphy,* 223 Iowa, 333, 336, 271 N. W. 899, the court was asked to decide a case on the definition of the word "premiums" but declined to do so, stating, p. 900:

"But a mere definition is not always a safe foundation for correct conclusions. One reason is that, except in mathematics, it is difficult to frame *exhaustive* definitions of words. . . . Consequently, unless the authority offering the definition has undertaken the difficult task of framing a definition that is exhaustive, and has succeeded in such undertaking, error may result if there be reliance upon the element of exhaustiveness."

In *State v. Hogan,* 8 N. D. 301, 78 N. W. 1051, the court referred to their statute which in substance defined insurance as a contract whereby one undertakes to indemnify another against loss arising from an unknown or contingent event. At p. 303 the court said:

"Necessarily, in defining insurance in a single sentence, only the most general terms can be used, and any general definition must be extended to cover the ever-changing phases in which the subject is presented to the public. Fifty years ago it was thought that a single chapter in any work on contracts could exhaust the law of insurance. Now Mr. Joyce presents the subject in four elaborate volumes, showing the immense development of that branch of the law. . . ."

"An association may be a mutual life insurance company, however, notwithstanding the organization is benevolent and not speculative in its purposes; and, if the purpose and object of an association is the collection of assessments from living members to pay the beneficiary of a deceased member, it is an insurance company, whatever the terms of paying the consideration or the mode of paying the loss. . . ." 7 C. J., Beneficial Associations, p. 1052, sec. 1, note 8 (d).

In 29 Am. Jur., Insurance, p. 49, sec. 4, it is said:

"Whether a corporation or association is engaged in the insurance business must be determined by the particular objects which it has in view, and not by abstract declarations of general purposes; the business which the organization is actually carrying on, rather than the mere form of the organization, is the test for determining whether it is carrying on an insurance business. The name by which a company or association, or its certificates or policies, are designated is not determinative of the question whether the organization is an insurance company or association or its contracts are in the nature of insurance policies. It is immaterial, or at least not controlling, that the term 'insurance' nowhere appears in the contract the nature of which is to be determined; indeed, the fact that it states that it is not an insurance policy is not conclusive, and a company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance." See cases in notes 1, 2, 3, 4, and 5.

In *Prairie du Chien Sanitarium Co. v. Prairie du Chien,* 242 Wis. 262, 7 N. W. (2d) 832, the question was whether a corporation which maintained a hospital and sanitarium was

a benevolent association so as to be exempt from taxation. At p. 265 the court said:

"Obviously neither a single test nor isolated answers to each of the questions posed above will automatically determine when a hospital is a benevolent association. The facts of each case must be regarded as a whole and the substance of the scheme of operation as it exists must be examined." To same effect see *Rogers Memorial Sanitarium v. Summit*, 228 Wis. 507, 509, 279 N. W. 623.

Many of the cases cited by appellant in support of its argument that it is not engaged in the insurance business are based upon particular statutes in force in the different jurisdictions, and cannot be regarded as applicable to the instant case. Appellant's only contention is that its articles of incorporation do not show that its business and purpose is to engage in the business of insurance, and that the manner in which it has operated and now operates does not establish that it has and now is engaged in such business. Of course, if defendant is engaged in any form of insurance it has violated and is violating ch. 180, Stats., specifically sec. 180.01, Stats., under which it was organized.

We are of the opinion that defendant's plan of operation brings it within the insurance field and the judgment must be affirmed.

*By the Court.*—Judgment affirmed.