GETCHELL & MARTIN LUMBER & MANUFACTURING COMPANY, Plaintiff, Appellee, v. PETERSON & SAMPSON and THE NATIONAL SURETY COMPANY, Defendants, Appellants, and H. W. McQUAID, W. V. McQUAID, and the CHICAGO LUMBER & COAL COMPANY, Defendants, Appellees.

124  599
124  618
f124 619

124  599
130  663

124  599
137  495

**Contractor's bond:** LIABILITY OF SURETIES TO MATERIAL MEN. Where
1 it appears from the proven circumstances and conditions of the building contractor's bond, that it was the purpose of the bond not only to secure the owner of the building but subcontractors and material men also, the latter may maintain an action in their own

name against the sureties for material furnished, although they are not specially named in the bond and no consideration passed directly from them to the sureties.

**Liability of sureties:** FALSE REPRESENTATION. The mere fact that a builder's contract and bond refer to the obligee in the bond as " owner " of the premises, when in fact the legal title is in another, is not such a false representation as will release the surety from liability.

**Liability of sureties:** INTEREST. The liability of a surety on a bond is the full amount of the penalty named, to which may be added interest from the time the obligation to pay arose.

**Liability of sureties:** PAYMENT OF CONTRACT PRICE. The contention that sureties on a contractor's bond are not liable until the owner has paid the full contract price, is not tenable, where the full sum is accounted for by the amounts actually paid the contractor, allowed the owner as damages, and the balance is paid into court.

**Appeal.** An issue not raised upon the trial, but presented upon appeal merely by assertion in argument with a simple reference to "the files in this court," will not be considered.

**Building contract:** PAYMENT UPON ARCHITECT'S CERTIFICATES. Under a building contract providing for payments to the contractor upon written certificates of the architect based on estimates to be made by him of the amount earned, where there is no specified form of certificate, any form of statement which intelligibly conveys to the parties the required information is sufficient, including bills presented for payment which are indorsed by the architect " O. K."

**Agency:** AUTHORITY. Under the record it is held, that the resident official agent of a surety company who issued a contractor's bond, had authority to bind her principal by the approval of payments made to the contractor.

**Agency:** PROOF OF AUTHORITY. The offer of a printed blank, with the statement of the agent that her commission was issued upon a blank of the same kind, is not competent evidence of her authority.

**Surety companies:** AGENCY. The law of agency relating to the contract liability of insurance companies is applicable to surety companies.

**Surety bonds:** SUBCONTRACTOR'S RIGHTS. Where a contractor's bond is given to protect a subcontractor as well as the owner of the property, an act of the latter for which the subcontractor is not responsible, will not affect his rights.

*Appeal from Polk District Court.*— HON. W. H. McHENRY, Judge.

WEDNESDAY, JULY 13, 1904.

THE opinion states the case.—*Affirmed.*

*Ryan, Ryan & Ryan,* for appellants.

*Spurrier, Forbes & Mills, C. C. & C. L. Nourse* and *Clark & McLaughlin* for appellee.

WEAVER, J.— The defendant H. W. McQuaid entered into a written contract with the firm of Peterson & Sampson, whereby the latter undertook to furnish the labor and materials and erect for the former a dwelling house in the city of Des Moines for the agreed compensation of $2,897. The work was to be done under the direction and to the satisfaction of Libbe, Nourse & Rasmussen, architects. Payments upon the contract price were to be made from time to time, according to the progress of the work, in manner stated as follows:  " An estimate to be given by the architects for eighty-five per cent. of the amount of work and material in place at the time estimate is given.  The final payment shall be made within thirty-two days after this contract is fulfilled.  All payments shall be made upon written certificates of the architects to the effect that such payments have become due."  It was also provided that upon a certificate by the architects that the contractors had failed to perform the work as agreed, or to prosecute it with proper diligence, the owner might terminate the employment, take possession of the building, and proceed to its completion; and, if the expense thus incurred should exceed the unpaid balance of the contract price, the contractors would make good the loss.  To secure the due performance of the contract, Peterson & Sampson, together with the National Surety Company, made and delivered to the said H. W.

McQuaid their bond, the material part of which is the following words:

Know all men by these presents, that we, Peterson & Sampson as principal, and National Surety Company as sureties, are held and firmly bound unto H. W. McQuaid, Des Moines, Iowa, *and to all persons who may be injured by any breach of any of the conditions, of this bond,* in the penal sum of one thousand ($1,000) dollars, lawful money of the United States, for the payment of which sum well and truly to be made, we bind ourselves, our heirs, legal representatives and assigns, jointly and severally, firmly by these presents. The condition of the above obligation is such, that whereas the said Peterson & Sampson, entered into contract with H. W. McQuaid, bearing date the 10th day of July, 1901, wherein said Peterson & Sampson undertakes and agrees to erect frame residence on Linden street, Des Moines, Iowa, and to faithfully perform all the terms and requirements of said contract within the time therein specified, in a good and workmanlike manner, and in accordance with the plans and specifications attached to said contract, and made a part thereof. Now, if the said Peterson & Sampson shall well and truly perform the covenants and stipulations in said contract contained, and pay all damages which may be sustained to the said H. W. McQuaid, *and to any person or persons, resulting from the negligence of said Peterson & Sampson,* their agents or employes in the performance of said work, and well and truly *pay all claims for labor and material furnished, for said work,* and save said H. W. McQuaid harmless from any and all claims for damages, as aforesaid, and from any liens and claims for labor and material under the laws of the State of Iowa, then this bond to be void, otherwise to remain in full force and effect.

Peterson & Sampson proceeded with the construction of the house, but, failing to complete it within the time agreed, McQuaid took possession, and employed other mechanics to finish the work. Before the discharge of the contractors they had purchased materials for the building in considerable amounts from the plaintiff and from the defendant Chicago Lumber & Coal Company, whose claims on such accounts are unpaid. This action was begun by

the plaintiff to establish and enforce a lien upon the building for the amount of its said claim. Subsequently, by an amendment to its petition, the surety company was made a defendant, and recovery demanded upon the bond to which reference has already been made. The defendant Chicago Coal & Lumber Company by cross-bill also sets up the indebtedness of Peterson & Sampson to itself for materials, claims a lien therefor on the building, and asks to recover the amount of said claim from the surety company on the bond. H. W. McQuaid, answering, alleges that of the contract price of $2,897 he has paid to Peterson & Sampson $2,003.54, and expended the further sum of $252.95 in completing the building after the contractors were discharged, leaving in his hands an unexpended balance of $640.51, against which he makes a claim of further damages in the sum of $300 on account of the failure of said contractors to have the building ready for use within the time fixed by the contract. The surety company denies all liability on the bond for the alleged reasons; (1) that it was deceived and misled into signing the bond by false representations of H. W. McQuaid as to the ownership of the land on which the building is erected; and (2) that, without its consent, McQuaid failed to observe the terms of the contract, and made payments to Peterson & Sampson without requiring certificates and estimates from the architects. By the decree of the trial court plaintiff's claim for a lien was established in the sum of $812.60, and subject thereto, the lien of the Chicago Lumber & Coal Company was also established for $593.78. It was also found that, after giving McQuaid credit for all payments made on the contract, and for all damages to which he was entitled, there remained in his hands applicable to the claims of subcontractors the sum of $400.51, which sum he was ordered to pay over to the plaintiff, to be applied in reduction of the amount of its recovery as aforesaid. It was further adjudged that the surety company be required to pay upon the bond in suit the sum of

$1,045, the same to be applied *pro rata* to the discharge of. the judgments in favor of plaintiff and the Chicago Lumber & Coal Company, and, in case such judgments shall have been discharged by McQuaid or by the sale of his property, he shall be entitled to receive the indemnity paid by said surety. From this decree the surety company and Peterson & Sampson alone appeal, and of these appeals that of the surety company is alone argued.

Counsel for the appellant have simplified the somewhat complicated record by stating certain specific propositions upon which they rely for a reversal, and we shall confine our review entirely to the questions thus presented. These propositions are: (1) that the payments by McQuaid to Peterson & Sampson were made without requiring the architects' estimates and certificates, thus releasing the surety; (2) the bond never became of binding force or effect, because of the false representations by McQuaid as to the ownership of the property; (3) the surety cannot be held liable beyond the compensation named in the contract; (4) there is no privity of contract between the subcontractors and the surety. McQuaid is the only person protected by the bond, and the only person who can maintain action upon it; (5) no recovery can be had against the surety until the entire contract price has been paid by the owner; (6) since the trial below, McQuaid has taken an assignment of the subcontractors' claims; and (7) judgment cannot be rendered against the surety in excess of the penalty named in the bond.

I. Reversing to some extent the order of discussion pursued by counsel, we first consider whether there is any such privity between the subcontractors and surety as will enable the former to maintain an action upon the bond. **1. CONTRACTOR'S BOND: liability of sureties to material men.** Whatever may have been the rule of the earlier cases in other jurisdictions, it is well established in this State — as it is in many others — that a promise made by one person to another for the benefit of a third person

may be enforced by the latter in an action in his own name. *Schemerhorn v. Vanderheyden,* 1 Johns. 140 (3 Am. Dec. 304); *Lawrence v. Fox,* 20 N. Y. 268; *Hall v. Marston,* 17 Mass. 575; *Johnson v. Knapp,* 36 Iowa, 616; *Knott v. R. R.,* 84 Iowa 468; *McHose v. Dutton,* 55 Iowa, 728; *Bank v. Rowley,* 92 Iowa, 535. See, also, authorities collected in 15 Ency. Pl. & Pr. 510. This rule has often been applied to bonds of similar nature to the one now under consideration. *Jordan v. Kavanaugh,* 63 Iowa, 152; *Baker v. Bryan,* 64 Iowa, 561; *Whitehouse v. Surety Co.,* 117 Iowa, 328; *Doll v. Crume,* 41 Neb. 655 (59 N. W. Rep. 806); *Kauffmann v. Cooper,* 46 Neb. 644 (65 N. W. Rep. 796); *Am. S. Co. v. Thorn-Halliwell Cement Co.,* 9 Kan. App. 8 (57 Pac. Rep. 237); *Burton v. Larkin,* 36 Kan. 246 (13 Pac. Rep. 398, 59 Am. Rep. 541); *Am. S. Co. v. Reeder,* 15 Ohio Cir. Ct. R. 47 (8 O. C. D. 684). Following the doctrine thus stated, if the language of the bond and the proved circumstances of the case make plain the intention of the parties to secure not only the owner of the building, but the laborers and material men as well, then the latter may avail themselves of the security thus provided, even though they are not specifically named in the bond, and no consideration passes directly from them to the surety. That the bond in suit was intended to secure the debts incurred by Peterson & Sampson for labor and materials admits of no reasonable doubt. By its express terms the obligation runs not alone to McQuaid, but to " all persons who may be injured by any breach of its conditions." Among those conditions it is stipulated that Peterson & Sampson shall well and truly perform their contract, and " well and truly pay all claims for labor and material furnished for said work." Nor is this assurance to the subcontractors a mere gratuity. It was to the direct and material advantage of all concerned (including the surety) that Peterson & Sampson should have a credit which would enable them to procure labor and materials with which to perform the work, and thus avoid the loss and damage which

otherwise might have resulted. It is true the primary purpose of the bond was to secure McQuaid, and a more effective measure to accomplish that end could scarcely be desired than by securing to the subcontractors payment for labor and materials furnished — a class of claims constituting the chief hazard to which the person who lets a building contract is exposed. The promise here sued upon is explicit, and the sufficiency of the consideration is indisputable. The objection to the right of the subcontractors to maintain action upon the bond is not well taken.

II. The defense based upon alleged false representations has no support in the record. True, it appears that the legal title to the lot upon which the house stands is in

2. LIABILITY OF SURETIES: false representation.

W. V. McQuaid, and not in H. W. McQuaid. No representation as to the title is shown to have been made, except as the same may be inferred from the fact that the contract and bond speak of H. W. McQuaid as the " owner " of the premises. The term " owner " is one of quite general application, and is frequently applied to one having an interest in or claim upon property much less than absolute and unqualified title. Code, sections 2311, 3096; *Burns v. Keas,* 21 Iowa, 257; *Adams v. Beale,* 19 Iowa, 61; *Swan v. Harvey,* 117 Iowa, 58. Ownership may be qualified or unqualified, legal or equitable, and from the mere fact that the legal title of this lot is not in H. W. McQuaid it does not follow that he is not the owner of a title which is good against the world. There is no pretense that he is not the owner of the building, or that he is a trespasser upon the land. Presumably he is rightfully in possession, and for the purposes of the contract and of all parties thereto he is the owner.

III. Of the contention that the surety upon a contractor's bond " cannot be held liable for anything beyond the

3. LIABILITY OF SURETIES: interest.

contract price " of the building it is perhaps sufficient to say that, if McQuaid were the sole obligee or beneficiary of the bond, we can conceive

of circumstances where the rule asserted by counsel might be applicable. But the obligation with which we here have to deal is dual. It promises the owner the completion of his house at contract price, and it also promises the subcontractors that the labor and materials contributed by them shall be paid for. The only limit to this obligation is the penalty therein named. In this connection we may also refer to the objection that the recovery adjudged upon the bond exceeds the penalty. The excess complained of is apparent only. In a recent decision by this court it was held that, while the debt for which the surety can be held liable is limited by the penalty named in the bond, yet interest may be collected on such debt from the time when it became the surety's duty to pay it, even though the aggregate of principal and interest is more than the penal sum. *Ellyson v. Lord,* 124 Iowa, 125. The surety is not in fact charged more than the penalty, but he is charged as of the date when he should have paid the debt, and if, by his neglect or refusal to pay, interest accrues, he is himself alone to blame. 37 Central Law Journal 108. At the beginning of this suit the unpaid claims for which appellant was held liable were a little less than $1,000. The defense interposed delayed the disposition of the case for a year. The judgment, when reduced by the interest accruing during pendency of the action, is less than the penalty of the bond.

IV. The further proposition that the surety cannot be held liable to respond to an action on the bond until the owner has paid the full contract price seems to have no fair application to the record. It was the right of 4. Liability of sureties: payment of contract price. McQuaid to withhold a fifteen per cent. margin of the contract price until the building was completed, and when litigation arose he could do no more than to bring the money into the court, and ask to have its proper application adjudicated. This he did, and by the order of the court all the money left in his hands was applied as a credit upon the plaintiff's claim, reducing by that

amount the sum for which the bond was liable. It is true, the court appears to have allowed him damages for the failure of the contractors to complete the building within the contract time, and to the extent of that allowance the money may be said to be still in his hands. But we think there is no rule of law which would require him to leave such claim unpaid, and turn the money into court, or to the subcontractors, for the benefit of the surety. It is said the bond only indemnifies McQuaid against damages sustained on account of the negligence of the contractors. Even if this be so, is not negligence of the contractors the gist of the owner's complaint that the building was not completed until long after the time agreed upon? But the bond is not subject to any narrow interpretation in this respect. The undertaking is general that Peterson & Sampson will " well and truly perform the covenants and stipulations " in the contract, and the surety clearly assumed liability for any and all damages naturally and directly resulting to the obligee from the failure of the contractors to do the work in the manner and within the time specified.

V. The objection that McQuaid has taken an assignment of the claims against the appellant is also unavailing. No such issue was raised in the trial, nor is the alleged fact presented here by any abstract, or brought to our attention by motion, or otherwise than by a clause in appellant's argument asserting the alleged fact, and referring us to the " files in this court " for its justification. We cannot undertake to consider questions thus presented. But, even if we should consent so to do, there is nothing in the files before us sustaining the claim thus made. We do find, by examination, notice of an assignment by the Chicago Lumber & Coal Company of its claim to W. V. McQuaid, who was not a party to the bond, and, so far as appears in the record, was not in any manner concerned in the building contract. There is no apparent reason why such assignee does not succeed to all the rights of the as-

5. APPEAL.

signor. Indeed, even if H. W. McQuaid were the assignee, we see no good reason why a judgment enforceable in the hands of the Chicago Lumber & Coal Company would be any less enforceable in his.

VI. The only remaining ground upon which a reversal is asked is the alleged failure of McQuaid to exact architects' estimates and certificates for the several payments 6. BUILDING CON- made by him to Peterson & Sampson. The
TRACT: payment
upon archi- terms of the contract in this respect have al-
tect's certifi-
cates. ready been stated, and we have to inquire whether any material or substantial departure therefrom has been shown. It appears without controversy that while Peterson & Sampson were in charge of the work McQuaid paid them on account of the contract various sums aggregating $2,003.54. The first installment of $1,000 and the second of $500 were paid upon certificates in the following form: " This certifies that Peterson & Sampson, contractors for residence on Linden street, are now entitled to a payment according to contract. The net amount of such payment shall be —— Dollars. Libbe, Nourse and Rasmussen." A third payment, of $109, was made by McQuaid upon a bill or account which was attested or certified to by the architect's indorsing thereon, " O.K. Libbe, Nourse and Rasmussen." Other small items or bills to the amount of $394.54 were also paid by him. These appear to bear no certificate or attestation save the following: " O.K." signed by " C. S. Egbert, Nat'l Surety Co.," or " C. S. Egbert, Agt. Nat'l Surety Co.," or " C. S. Egbert, Agt.," or " C. S. Egbert." Miss Egbert, whose name here appears, was at that time the resident assistant secretary and agent of the appellant surety company. Of her authority in the premises we will presently speak. The purpose of the requirement for architects' certificate and for the fifteen per cent. reserve is not at all problematical. The certificate was to evidence the fact that the work for which the contractors received the payment had in fact been done, and the margin

reserved was to afford some measure of security against any subsequent default on their part. It was, of course, a duty which the owner owed to the surety to see that this security was not released or lost, and that the money was paid only in substantial accord with the terms of the agreement. No complaint is made that the fifteen per cent. reserve was not properly withheld. There is no showing or claim that Peterson & Sampson had not in fact earned each and all of the several payments received by them. The objection rests solely upon the claim that the payments were made without proper certificates and estimates, and that such act, if there be no waiver, releases the surety from liability, without regard to whether such payments were or were not earned. Assuming (without deciding) that such is the law, let us see whether the alleged fact upon which this defense rests is shown by the record. The contract, as we have seen, provides for an "estimate to be given by the architects for eighty-five per cent. of the amount of work and material in place," and that "payments shall be made upon written certificates of the architects." It will be noted that the "estimates" are not required to be in writing, hence the absence of such writing constitutes no violation of the contract. *Roberts v. Watkins,* 8 Law T. (N. S.) 460; *Kirk v. Bromley,* 2 Ph. 640. Indeed, we see no reason why, properly interpreted, the certificate of the architects that a specified sum is due and payable to the contractors may not itself be regarded an estimate — implied, if not expressed — within the meaning of the agreement. And certainly, unless we are to indulge in strained and hypercritical interpretation of the words employed, the certificates upon which the payments of $1,000 and $500 were made must be said to be sufficient to all reasonable intents and purposes.

Whether the architects' "O.K." indorsement of other bills for payments may fairly be held to be a compliance with the contract depends upon the meaning to be attached to that abbreviation or symbol. It should also be here noted

that, while the certificate is required to be in writing, no particular form is prescribed by the contract. As already remarked, the purpose of the certificate is to witness the fact that the sum named therein has been earned, and any form of written communication which conveys that information intelligibly and to the satisfaction of the parties should be held sufficient. Now, " O.K." may have no title to be classed as " elegant English," but in the business life of this country it has for many years been in common use, and has acquired a meaning which is not at all obscure or uncertain. Webster's International Dictionary defines it as " all correct." The Century Dictionary gives its meaning as " all right; correct; now commonly used as an indorsement, as on a bill." It is neither more nor less than a brief, but expressive, certificate of the correctness of the bill or claim on which it is indorsed. In the present case it was clearly intended to certify to McQuaid that Peterson & Sampson had earned and were entitled to receive the amount of the claim, and, having been so understood and acted upon, the surety should not be heard to complain because the same idea was not couched in more classic phrase. Even though the certificate be entirely omitted, it has been held that the surety will not be discharged if it clearly appears that the payments made were in fact earned, and were within the permitted limit or percentage of the work done. *Kaufmann v. Cooper,* 46 Neb. 644 (65 N. W. Rep. 796); *King v. Murphy,* 49 Neb. 670 (68 N. W. Rep. 1029); *Smith v. Molleson,* 148 N. Y. 241 (42 N. E. Rep. 669); *Cowles v. Fidelity Co.,* 32 Wash. 120 (72 Pac. Rep. 1032); *Hand Mfg. Co. v. Marks,* 36 Or. 523 (59 Pac. Rep. 549). In a case presenting objection to the sufficiency of the certificates the Illinois court has said: " No doubt the certificates were informal. Any certificate which is in fact an architect's estimate it is apprehended will be sufficient." *Finney v. Condon,* 86 Ill. 80. Where the form of the certificate is not fixed by the contract, a simple statement to the effect that a certain sum is now due

has been held to justify payment by the owner. *Snaith v. Smith* (Com. Pl.), 27 N. Y. Supp. 379; *Bloodgood v. Ingoldsby*, 1 Hilt. 388; *Wyckoff v. Meyers*, 44 N. Y. 143. An order drawn by the architect on the owner in favor of the contractor has also been held to be a good certificate. *Mercer v. Harris*, 4 Neb. 77.

A somewhat different, and perhaps more difficult, question arises upon the bills and claims indorsed by Miss Egbert. She was the appellant's resident assistant secretary and agent, and issued the bond in suit. In approving these claims for payment, she was acting in the appellant's interest. Concerning her own understanding of her authority in the premises, she says she was not authorized to " change or modify the terms of the bond," or to " waive the certificates of the architects "; but the force of this declaration, it is evident, depends upon her own conception of what will constitute a " change " or " waiver." Taking her testimony as a whole, it clearly appears that she understands that in certifying or " O.K.'ing " the bills for payment she was acting within the scope of her duties as the appellant's representative, subject only to the restriction that the aggregate of such certificates be kept within the contract limit of eighty-five per cent. of the amount actually earned by the contractors. She says of the bills approved by her: " They were ' O.K.'d ' simply to draw out the money up to the contract, but after that amount had been drawn there could not be any money drawn over. That was my understanding. To ' O.K. ' any bills over and above that would make an agreement for the company, which no agent could do. * * * I ' O.K.'d ' them because there was that money due on the contract. Stopped when the payment arrived at the amount provided for in the contract. That was my idea. I knew how much money was on hand the day that I ' O.K.'d ' the last bill." She further says that all the bills thus approved by her " had been previously ' O.K.'d ' by the architects." Whether she means that she

*Margin note:* 7. AGENCY: authority.

received the architects' written certificate in each instance
is not clear, but in some manner or form satisfactory to her
she obtained assurance from the parties to whom the deter-
mination of the amount due was intrusted that the payments
thus allowed were within the contract limit, and acting in
the name of the surety company, she consented that they be
made. As the resident official representative and agent who
issued the bond, we think it must be assumed that in doing
these things she was acting within the scope of her authority.
Whether such acts operate as a waiver of any defense which
otherwise might have been made to an action on the bond is a
conclusion which cannot be controlled by the opinion of the
agent as a witness. Indeed, there is no evidence in the rec-
ord tending to support the claim made in argument that Miss
Egbert was not authorized to do just what she did in fact do
in approving the bills.

In the course of her examination as a witness it ap-
peared that she held a written appointment or commission
from the company; but the instrument was not put in evi-
dence; nor was its absence properly accounted
for. She was shown a printed blank, and asked
whether her commission was not " upon a blank
like the same," and over proper objection by the appellee
she answered in the affirmative. To the blank thus offered
were attached what purported to be copies of several sections
of the by-laws of the surety company. It needs scarcely to
be suggested that the evidence thus offered is incompetent.
Moreover, even if the objection be waived, we find nothing
in the documents which negatives the authority of Miss
Egbert to do as was done by her in the case at bar.

It has been held that an agent authorized to solicit in-
surance and attest or countersign and issue policies is a
general agent, and his acts and knowledge in ref-
erence to the risk assumed are the acts and
knowledge of his principal; and, without at-
tempting to say that appellant is to be held as doing an insur-

8. Agency: proof of authority.

9. Surety compa-
nies: agency.

ance business, the method by which its business is obtained and its obligations or contracts are issued to its patrons is much the same, and we see no reason why the law which governs an agency in one case is not equally applicable to the other. *So. Bend Co. v. Dakota Co.,* 3 S. D. 205 (52 N. W. Rep. 866) ; *Hahn v. Guardian Co.,* 23 Or. 576 (32 Pac. Rep. 683, 37 Am. St. Rep. 709) ; *Hastings v. Ins. Co.,* 138 N. Y. 473 (34 N. E. Rep. 289) ; *Syndicate Co. v. Catchings,* 104 Ala. 176 (16 South. Rep. 46) ; *Commercial Co. v. Morris,* 105 Ala. 498 (18 South. Rep. 34) ; *Parsons v. Ins. Co.,* 132 Mo. 583 (31 S. W. Rep. 117, 34 S. W. Rep. 476) ; *German Ins. Co. v. Rounds,* 35 Neb. 752 (53 N. W. Rep. 660) ; *Coles v. Jefferson,* 41 W. Va. 261 (23 S. E. Rep. 732) ; *Kahn v. Traders' Ins. Co.,* 4 Wyo. 419 (34 Pac. Rep. 1059, 62 Am. St. Rep. 47) ; *Millville Co. v. Mechanics' Ass'n,* 43 N. J. Law, 652; *Whited v. Ins. Co.,* 76 N. Y. 415 (32 Am. Rep. 330) ; *Union Ins. Co. v. McGookey,* 33 Ohio St. 555 ; *Georgia H. Co. v. Jacobs,* 56 Tex. 366; *Georgia H. Co. v. Kinnier's Adm'x,* 28 Gratt. 88. In a somewhat similar case, to which the appellant herein was a party, the surety was held bound by the act of the resident agent, although he testified that he had no authority to so act without the surety's approval; the ruling being grounded upon the principle that such secret restrictions upon the agent's power will not affect the rights of the parties dealing with him without knowledge of the limitations. *Anderson v. Nat. S. Co.,* 196 Pa. 288 (46 Atl. Rep. 306).

The owner of the building in the present case appears to have exercised more than an ordinary degree of care to keep within the letter and spirit of his contract, and to do nothing of which the surety company could justly complain. He paid no bill without the architects' certificate, except as he first obtained the approval of the company itself through its representative. That representative gave the desired approval only upon receiving from the architects satisfactory assurance that the money had been earned. So far as we can see,

the rights and interest of the company were scrupulously guarded, and there is no good ground for holding the surety discharged because of irregularity in the payments.    Even if the surety should be held released, on this account, as to the owner, it would not follow that it is also released as to the claims of the subcontractors.

10. SURETY BONDS: subcontrac-tors' rights.

The bond being given for the benefit of the latter as well as the former, their right of action cannot be affected by an act for which they are in no manner responsible.    Their right is not derived from, nor held under, the owner of the building, but is an independent right, of which they are not to be deprived save by their own act or default.    This rule is reasonable in itself, and has frequently been applied in actions upon bonds intended to secure two or more independent obligees.    *Doll v. Crume,* 41 Neb. 655 (59 N. W. Rep. 806) ; *Steffes v. Lemke,* 40 Minn. 27 (41 N. W. Rep. 302) ; *Conn v. State,* 125 Ind. 514 (25 N. E. Rep. 443) ; *Dewey v. State,* 91 Ind. 173; *United States v. Nat. S. Co.,* 34 C. C. A. 526 (92 Fed. Rep. 549).

In view of this conclusion we need not here consider the rule cited by counsel which makes a surety " a favorite of the law " nor determine whether a surety company making the signing of bonds a matter of business and profit is in all respects entitled to the protection of rules designed to protect a class of persons assuming obligations of others as a matter of friendly accommodation, and without consideration to themselves.    Neither need we here decide how far, if at all, the business of a surety company partakes of the nature of insurance, or is governed in an action upon its bond by the rules of construction and of evidence applicable to that class of contracts.    Corporate suretyship and contract insurance are a development of recent years, and the law applicable thereto is not yet fully crystallized into any well-defined code of principles.    But see *Am. Surety Co. v. Pauly,* 170 U. S. 133 (18 Sup. Ct. 552, 42 L. Ed. 977) ; *Fenton v. Fidelity Co.,* 36 Or. 289 (56 Pac. Rep. 1096, 48 L. R. A. 770) ;

*Stevens v. Elver,* 101 Wis. 392 (77 N. W. Rep. 737); *Cowles v. U. S. Fidelity & Guar. Co.,* 32 Wash. 120 (72 Pac. Rep. 1032); *People v. Rose,* 174 Ill. 310 (51 N. E. Rep. 246, 44 L. R. A. 124); *Shakman v. U. S. Credit S. Co.,* 92 Wis. 366 (66 N. W. Rep. 528, 32 L. R. A. 383, 53 Am. St. Rep. 920); *Walker v. Holtzclaw,* 57 S. C. 459 (35 S. E. Rep. 754); *Champion Ice Co. v. Am. B. & T. Co.* (Ky.), 75 S. W. 197; *Industrial Co. v. Tod* (Sup.) 67 N. Y. Supp. 362; *Chaffee v. Fidelity Co.* (C. C. A.) 128 Fed. 918; Elliot on Insurance, section 8. This case is not governed by *Queal v. Stradley,* 117 Iowa, 748; *Stillman v. Wickham,* 106 Iowa, 597, and cases of that nature, cited and relied upon by appellant. In the case last named the owner, without the consent of the surety, practically abandoned the contract, and himself undertook the control of the work and purchase of material, and otherwise manifested a total disregard of the rights of both contractor and surety. In the *Queal Case* the contract bound the owner to pay only when the contractor furnished " receipted bills or waivers for material and labor " as the work progressed, but payments were made without exacting these vouchers, to the manifest prejudice of the surety. In neither is the principal question now presented — the right of a subcontractor to maintain action upon the bond in his own name and right, independent of the owner of the building — referred to or decided. Neither does this case come within the rule of *Green Bay Lumber Co. v. Independent School Dist. of Odebolt,* 107 Iowa, 672, where the terms of the bond differ materially from the one now in suit. The difference between the two classes or lines of precedents is there clearly pointed out, and need not be again stated.

We have given the case careful consideration, and are of the opinion that the conclusion arrived at by the trial court is right. The decree appealed from is AFFIRMED.