### INTERNATIONAL FILTER CO. v. CONROE GIN, ICE & LIGHT CO. (No. 1176.) *

(Court of Civil Appeals of Texas. Beaumont. Jan. 30, 1925. Rehearing Denied Feb. 11, 1925.)

1. **Sales ☞23(1)—Proposal to install water filter held offer from buyer to seller.**

Proposal for installation of water filter contained in seller's letter, providing that it would become contract when accepted by buyer and approved by executive officer of seller, held offer from buyer to seller.

2. **Sales ☞23(3)—"O. K." of seller's executive officer indorsed on buyer's offer held acceptance thereof.**

"O. K." indorsed by seller's executive officer on buyer's offer, held acceptance of offer.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, O. K.]

3. **Sales ☞23(3)—Seller held required to communicate acceptance to buyer before contract complete.**

Where buyer's offer provided that it should become contract on its approval by seller's executive officer, seller was required to communicate its acceptance to buyer before contract was complete.

4. **Sales ☞54 — Ambiguous provision of contract construed against seller, whose language it was.**

Ambiguous provision of contract should be construed most strongly against seller, whose language it was.

5. **Evidence ☞450(8)—Buyer's testimony as to parties' understanding of ambiguous provision of offer held admissible.**

Buyer's testimony as to parties' understanding of ambiguous provision of offer requiring prompt acceptance thereof, held not to vary terms of written proposal, but was admissible to explain ambiguity.

6. **Sales ☞23(3)—Seller's acknowledgment of receipt of order held not acceptance.**

Seller's acknowledgment of receipt of order for water softener, thanking buyer therefor and asking for sample of water for analysis held not acceptance.

Appeal from District Court, Montgomery County; J. M. Combs, Judge.

Action by the International Filter Company against the Conroe Gin, Ice & Light Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Cole, Cole, O'Connor & Jones, of Houston, for appellant.

Foster & Williams, of Conroe, for appellee.

WALKER, J. This suit was instituted by appellant against appellee to recover damages for breach of contract. On a trial to the court without a jury judgment was rendered for appellee. Conclusions of law and fact were filed, and appellant has duly prosecuted its appeal.

On the 10th day of February, 1920, appellee forwarded to appellant, at Chicago, Ill., through appellant's agent, W. W. Waterman, the following proposal:

"International Filter Co., Incorporated. Water Softening and Filtration Plants. General Offices: First National Bank Building. Cable Address: Inflico Chicago. Codes: Liebers, Western Union. Woolworth Building, New York.
"Chicago, Feb. 10, 1920.
"Conroe Gin, Ice & Light Co., Conroe, Texas —Gentlemen: We propose to furnish f. o. b. Chicago, one No. 2 Junior (steel tank) International water softener and filter to purify water of the character shown by sample to be submitted. [Here follows description of the filter, conditions of payment, guaranties, etc.]

"This proposal is made in duplicate and becomes a contract when accepted by the purchaser and approved by an executive officer of the International Filter Company, at its office in Chicago. Any modification can only be made by duly approved supplementary agreement signed by both parties.

"This proposal is submitted for prompt acceptance, and unless so accepted is subject to change without notice.
"Respectfully submitted,
"International Filter Co.,
"W. W. Waterman.
"Accepted Feb. 10, 1920,
"Conroe Gin Ice & Lt. Co.,
"By Henry Thompson, Mgr.
"Current 110 volts, 60 cycles, single phase. Make shipment by March 10."

On the 13th of February, 1920, P. N. Engel, appellant's president, indorsed his O. K. on the foregoing proposal, as follows:

"O. K. Feb. 13, '20.       P. N. Engel."

On the 14th day of February, 1920, appellant wrote to appellee the following letter:

"Conroe Gin, Ice & Light Co., Conroe, Texas —Gentlemen: Attention of Mr. Henry Thompson, Manager. This will acknowledge and thank you for your order given Mr. Waterman for a No. 2 Junior steel tank International softener and filter, for 110 volt, 60 cycle, single phase current, for shipment March 10th.

"Please make shipment of the sample of water promptly so that we may make the analysis and know the character of the water before shipment of the apparatus. Shipping tag is inclosed, and please note the instructions to pack to guard against freezing.
"Yours very truly,
"International Filter Co.,
"M. B. Johnson."

Then followed the following correspondence:

"Conroe, Texas, Feb. 28, 1920.
"International Filter Company, Chicago, Ill.— Gentlemen: After considering the lateness of the season and the possibility that we might increase our capacity very soon, we have decided to cancel the order for the filter for the time being. We have no doubt, but that we will use one a little later.
"Yours truly,
"Conroe Gin, Ice & Light Company."

"March 2, 1920.
"Conroe Gin, Ice & Light Co., Conroe, Texas—Gentlemen: We have your letter of February 28th, stating that you desire to cancel your order for International softener and filter.

"This is a special job, and the steel tank has been ordered and built, and owing to the fact that very seldom do we have a call for steel tank, we are not in a position to cancel your order.

"We shall make shipment in accordance with the order and trust that you will be in a position to handle it.
"Very truly yours,
"International Filter Co.,
"G. A. Golder."

"Conroe, Texas, Mar. 4, 1920.
"International Filter Co., Chicago, Ill.—Gentlemen: We note what you have to say in your favor of Mar. 2d, relative to filter and in reply wish to advise that we find it impossible to use this filter this season, for reasons stated in our previous letter.

"We feel quite sure you have a much better chance to dispose of the tank than we will have in paying for the shipment. In fact, we cannot, under any circumstances, accept this filter at present. Yours truly,
"Conroe Gin, Ice & Light Company."

"Chicago, March 9, 1920.
"Conroe Gin, Ice & Light Company, Conroe, Texas—Gentlemen: In reply to your letter of March 4th:

"As stated in our letter of March 2d, the main softening tank of this softener has been ordered and is built. We sell very few of these steel tank softeners in these small sizes—and cannot accordingly accept cancellation except upon payment to us of the expenses to which we have been put in the handling of this order, including the selling expense on the same.

"Inasmuch as this amounts to an appreciable sum, we are just wondering whether you will not find it to your advantage to take and pay for the softener and get the benefit of its good work rather than pay the amount that it will be necessary to pay to make us whole and at the same time have no benefit from the expenditure.

"Complying with your request, we have stop-

ped work, and, unless we receive shipping instructions from you by wire, we will send you bill for our costs to date, payment of which we shall expect to receive without delay from you.

"Very truly yours,

"E–J                                    International Filter Co.

"Dict. by G. A. Golder."

"April 6, 1920.

"Conroe Gin, Ice & Light Company, Conroe, Texas—Gentlemen: We have not heard from you since writing you March 9th.

"The contract you entered into with us is not one that is subject to cancellation. We understand full well that it is any one's privilege to break a contract, but that doesn't mean that they don't have to pay the bill. This softener was practically completed when we got your order to hold up.

"The terms of the contract require payment of one-half of the contract price on presentation of bill of lading. It specifically provides that delay in the delivery or completion of the work, caused by purchaser, shall not operate to defer the payments, but, on the contrary, payments shall be made on such dates as they would reasonably have become due if the work had not been interrupted.

"We could readily have made shipment March 5th, if we had not been interrupted by you—accordingly the first payment of $615.00 is now 30 days past due. The contract further provides that default in payment of any installment when due renders the entire amount remaining unpaid at once due and payable. Accordingly, if we do not receive your remittance for your first payment promptly upon receipt of this, we shall, in accordance with the provision of the contract, look for payment of the entire amount without further delay, and shall take whatever steps are necessary to enforce the collection.

"The contract further states that if we are put to any extra expense by reason of the purchaser's delay, this amount shall be paid in accordance to the contract price. This steel tank is all made up and is in our way. We must put it in public storage at your expense, unless you give us shipping instructions promptly.          Yours very truly,

"PNE/OLB                          International Filter Co.

"Dict. by G. A. Golder."

The filter was never shipped to appellee and was in appellant's possession at the time of trial. We quote as follows from the testimony of Mr. Engel, appellant's president:

"It had no actual market value; at most it may have what might be called a potential value. The plant constructed for the defendant company was unlike any we had ever built before or since, because of specifications they made in regard to the construction. It was and is a perfectly good water softening plant for the Conroe Gin, Ice & Light Company or anybody else whose conditions are just like theirs. The trouble is that it is not commercially practical to find anybody it would suit.

"I can perhaps make this clearer by an illustration: It is as if an optician had made up some glasses according to a prescription furnished him and the buyer had then changed his mind about taking them. In making up the glasses the optician would use standard parts for the lenses and frame, but when once assembled they are useless to any one except the man who ordered them, or some one whose eyes and face happened to be exactly like his. If he could be found, the glasses would be all right. The trouble would be to find any such person. The same is true of this softener. It is made up of parts that were standard, but have been assembled to fit a particular case that is not standard. We cannot undertake to find some one who wants a softener just like this because we might not be successful; and even if we were successful, might expend in the effort more than the price that could be obtained.

"No part of the contract for said filtration plant has been paid by the defendant company. We have exercised our option to declare all payments due on failure of the defendant to pay the first installment of $615. We wrote to the defendant company on April 6, 1920, informing them of this action on our part. I have a copy of our letter of April 6, 1920, in my possession. I am handing the notary copy of letter of April 6, 1920, to file with my deposition, marked 'Exhibit D,' reading as follows. * * *

"I do not know whether our Bulletin J–63 was attached to the duplicate order left with the defendant—but it is not true that our softeners are kept in stock by us to fill orders with. Bulletin J–63 describes that Junior sizes of the International water softener with which we hold ourselves in readiness to supply the public, on specifications.

"This softener was different in that it was a steel tank softener, for which there is only a very, very limited demand in these small sizes.

"Plants that we manufacture have no market value except where they will fit in exactly with operating conditions."

Mr. Engel's deposition was taken a second time, and on the second taking, he testified:

"I am the same P. N. Engel who heretofore gave a deposition in this cause. I have partially answered this question in my answer to the preceding one. [Interrogatory referred to stricken out on objection.] While I do not consider that this plant has what can properly be called a market value, it undoubtedly has some value. This plant has a scrap or junk value. That is, it could be knocked to pieces and the material entered into its construction sold to a junk man. It also has a value as a water softening plant to any one whose conditions are the same or substantially the same as those at the Conroe Company, if such a person could be found. I would say that the scrap value of this plant is twenty-five ($25.00) dollars. This figure is in part based on an offer made for some of the material and my judgment as to what could be secured for the balance.

"Assuming favorable conditions—that is, that by a reasonable effort we are able to find a customer who would take this plant off our hands and that we could use it just as it is, or that we would have to make only such slight modifications that little expense would be involved—I would say that the highest value to be placed on this plant is three hundred ($300.-00) dollars. This value is what I before referred to as a 'potential value,' as it involves the assumption that we could find such a customer. This figure of three hundred dollars is based on my general knowledge of this business, in which I have been engaged for many years,

and on actual costs in connection with this particular plant. It is to be noted that this value of $300 is given as a maximum value under the assumption of favorable conditions."

Mr. Thompson, appellee's general manager, testified in its behalf as follows:

"Mr. Waterman called my attention to the last clause in the contract reading as follows: 'This proposal is submitted for prompt acceptance, and unless so accepted is subject to change without notice.' In answer to what Mr. Waterman said relative to that clause, I told him that it was late in the season and that we would have to have quick delivery; that we would have to have a definite answer immediately, if we were going to buy this filter. That was the sum and substance of it. He understood it was a rush order. I then signed that acceptance, so called. I told him I would have to have a quick answer.

"The filter described there in that instrument is sufficient to take care of the needs and care for an ice plant, I would say, up to 40-ton capacity. The capacity of our plant is 10 tons; was 10 tons at that time and still is. My observation is that the majority of plants, especially outside of cities, are plants with capacities from 10 tons up to 20 and 30 tons. The usual capacity of plants in town of the size of Conroe, and of towns up to the size of five or six thousand population, is from 10 to 40 tons; something like that. The town trade that we serve in Conroe will cover a population, I will say, of three thousand.

"A filtering plant of the size described in this instrument is an entirely separate and distinct piece of machinery from any other part of the plant, its purpose being to treat the water; it being a self-contained unit in itself and having nothing to do with any other part of the plant. It, of course, would have water pipe connections. The water filter described in this contract, which the proof shows is illustrated by Bulletin J-63, known as Junior No. 2, is absolutely adapted to any character of ice plant ranging from 10 to 40 tons. It is adaptable to use in any small plant.

"An illustration of the filter is shown on page 1 of Bulletin J-63. Bulletin J-63, which I now hold in my hand, was delivered to me along with a copy of the contract by Mr. Waterman. This is a picture of the plant as it would look ready for use. The larger portion of that cylindrical vessel as illustrated by this picture is the tank, its purpose being to mix the chemicals to give them a chance to dissolve in order to do their work as they pass through the water. That is the tank that the water is treated in. That tank is built of steel and wood—either steel or wood. It would make no difference in its adaptability to an ice plant whether that large tank, which receives the water to purify it, were made of wood or steel. The machinery which you see on top of that large cylindrical vessel is the apparatus for mixing the chemicals in the right proportion in accordance with the amount of water that goes through, it being merely mounted on top of the tank. This little machinery to the left of the tank is the filter, its purpose being to filter the water after it passes through this smaller vessel that is called the filter after the water has been treated. From there the water passes to the ice can ready to be used. This large treating tank, with the small filter on the side of it, with the mixing machinery that is installed on top of the treating plant, constitute a complete unit; and, if installed in connection with any ice plant, it would still be a separate and distinct unit. It could only be connected with the plant by pipes, of course. This mixing apparatus has a very small motor to connect it—connected with it—to operate the mixing apparatus. This mixing apparatus is installed on top. Then the little motor I spoke of furnishes the power to that mixer. Regardless of whether that tank was built of wood, or built of galvanized iron or any other kind of metal, it would be a separate and distinct unit. The mere fact that that large tank were built of galvanized iron instead of wood—the large purifying tank—would furnish no reason for it being a less distinct or separate unit."

On the foregoing evidence, the trial court filed the following conclusions of law and fact:

"Findings of Fact.

"First. I find that the instrument introduced in evidence by plaintiff, signed in its behalf by one Waterman and by the defendant company, was a mere proposal by defendant to plaintiff to buy property therein specified, and I find that such proposal was not accepted by plaintiff, and in this connection I specially find that the letter dated February 14, 1920, signed International Filter Company, M. B. Johnson, addressed to defendant company does not constitute an acceptance of said proposal.

"Second. I find that the defendant company by letter of February 28, 1920, canceled its order and withdrew its offer to contract, and that at the time said letter was written by defendant, and at the time it was received by plaintiff in Chicago, there had been no acceptance of plaintiff's proposal and offer to contract.

"Third. I further find that defendant's manager, Henry Thompson, when he signed, in behalf of defendant, the proposal referred to above, and which was signed on behalf of plaintiff by one Waterman, expressly stipulated that the plaintiff, through its proper officer, as specified in the proposal, must notify defendant promptly whether or not it approved the contract; and I find that this plaintiff failed to do, and that such failure was continuous up to and including the time when plaintiff received defendant's countermand, or cancellation letter, dated February 28, 1920. In this connection I further find that the letter of February 14, 1920, from the International Filter Company, signed by M. B. Johnson, addressed to the defendant, was the only communication of any sort from plaintiff to defendant before the letter of February 28, 1920, canceling and withdrawing defendant's offer, had been received by plaintiff. And I further find in this connection that there is no proof whatever that M. B. Johnson, who wrote said letter of February 14, 1920, was an executive officer of the plaintiff company, and I find that there is no proof that either he or the International Filter Company ever represented him to be such.

"Fourth. I find that the softener and filter described in the proposal introduced in evidence was not completed and ready, or substantially completed, for shipment when defendant's letter of cancellation and withdrawal, of date February 28, 1920, was received by plaintiff at Chi-

cago, and I find that the proof affirmatively shows that the necessary assembling, work, and preparation for shipment had not been done, and in this connection I further find that the proof fails to show the stage to which such work had progressed when said letter was received, and fails to show what was the reasonable value of the property at the time said cancellation was received by plaintiff in the state or condition it was at that time.

Fifth. I find that the man Waterman, whose name is signed to the proposal introduced in evidence, represented plaintiff in Texas, in soliciting an order for the softener and filter described in the proposal, and that he transmitted said proposal to plaintiff company at Chicago, for its consideration, after same had been signed in behalf of defendant company by its manager, Henry Thompson. Such signing of said proposal, and transmittal thereof to Chicago, were the only acts done in reference to the subject-matter of this suit in the state of Texas. In this connection I find that plaintiff is a corporation, organized and chartered under the laws of the state of Illinois, and that at the time of all the matters involved in this suit it had no license or permit or authority to transact business in the state of Texas. I find that the proposal and negotiations leading up to the signing of the proposal contemplated and constituted an act of interstate commerce.

"Conclusions of Law.

"First. I conclude that plaintiff had the right to maintain this suit in the courts of Texas, and the jurisdictional plea of defendant is overruled.

"Second. I find that the proof fails to establish a contract between plaintiff and defendant, and plaintiff therefore failed to show any right of recovery in this cause.

"Third. If a contract existed, I find that no recovery could be had by plaintiff, because the proof fails to furnish a basis for recovery of damages, in that it fails to show the reasonable value of the property in the condition in which it was at the time defendant's cancellation was received, and therefore furnishes no basis for measuring the damages, if any.

"On the foregoing findings of fact and conclusions of law the court adjudges that plaintiff should take nothing by this suit, and it was so ordered."

Opinion.

[1] 1. It is our conclusion that the proposal, which formed the basis of the contract sued on, though ostensibly from appellant to appellee, was, in law, from appellee to appellant. The trial court so found in accordance with appellee's contention. In its original brief, appellant concurred in this conclusion, saying:

"The contract was in the form of a proposal by the purchaser [the defendant] to the seller [the plaintiff] and was to become binding when the said defendant accepted it, which the defendant did do on February 10, 1920, and when it was approved by an executive officer of the plaintiff at its office in Chicago, which was done on February 13, 1920;"

—but in a supplemental brief filed later, appellant changed its position, saying:

"In passing, we find we inaccurately stated on page 32 of our original brief, that 'the contract was in the form of a proposal by the purchaser [the defendant] to the seller [the plaintiff]."

"We got the cart before the horse and it is just the reverse. As shown by the contract, it says; 'This proposal is made in duplicate and becomes a contract when *accepted* by the purchaser', etc. The proposal, therefore, under the terms of the contract was made by the appellant to the appellee for the latter's acceptance, which was duly indorsed thereon on February 10, 1920."

Whatever its form, appellee was submitting a proposition on which it was willing to contract for the filter. The proposal did not constitute a contract, and it was understood by all parties that it was not to constitute a contract until accepted by appellant. It is our conclusion that the parties, in attempting to contract, were dealing with this proposal as being made by appellee to appellant.

[2] 2. By indorsing his O. K. on appellee's proposal on February 13, 1920, Mr. Engel complied with the provisions of the proposal requiring that it be "approved by an executive officer of the International Filter Company at its office in Chicago." The trial court erred in concluding that this O. K. by Engel did not constitute an acceptance.

In Getchell & Martin, etc., Co. v. Peterson, etc., 124 Iowa, 599, 100 N. W. 550, the Supreme Court of Iowa said:

"Now 'O. K.' may have no title to be classed as 'elegant English,' but in the business life of this country it has for many years been in common use, and has acquired a meaning which is not at all obscure or uncertain. Webster's International Dictionary defines it as 'All correct.' The Century Dictionary gives its meaning as 'all right; correct; now commonly used as an indorsement, as on a bill.' "

A very interesting note is given to State v. Blanchard, 40 Okl. 447, 136 P. 305, Ann. Cas. 1915C, 192. By using this term Mr. Engel could only have meant to accept the proposal as made by appellee, and by using it he did so as effectively as if he had used the word "accepted."

[3, 4] 3. Appellant's mere acceptance of appellee's proposal did not complete the contract, but it was necessary for it to communicate such acceptance to appellee. That is the general rule, as stated by 9 Cyc. 270:

"Since communication of intention is essential to an agreement, an acceptance, like an offer, must as a rule be communicated to the offerer or put in the course of communication by act. There is a radical distinction in regard to communication between offers which ask that the offeree shall do something and offers which ask that the offeree shall promise something. In offers of the former kind communication of the acceptance is ordinarily not required; in offers of the latter kind communication of the acceptance is always essential."

Appellant would distinguish this case from the general rule on the proposition that "the

person making the offer has the right, if he pleases, to dispense with notice of acceptance, and if the form of the offer shows that this was not to be required, then it is not necessary." 9 Cyc. 270.

We do not agree with appellant's construction ·of the contract. This being appellee's proposal, effect must be given not only to the clause relied upon by appellant, "this proposal is made in duplicate and becomes a contract when accepted by the purchaser and approved by an executive officer of the International Filter Company at its office in Chicago," but also to the concluding clause, "this proposal is submitted for prompt acceptance, and, unless so accepted, is subject to change without notice." These two clauses are not repugnant to each other, but each can be given effect. By reserving the right "to change without notice," appellee reserved to itself the privilege of making such change until notified that appellant had duly accepted its proposal, which, under the clause relied on by appellant, was to be accepted in Chicago. Unless the clause last cited be given this construction it is meaningless as a part of the proposal upon which appellee was willing to buy the filter. If this construction does not follow, as a matter of law, from the contract, then we say its terms are ambiguous, and, as the proposal was written by appellant, its language should be construed most strongly against it.

[5] From the testimony of the witness Thompson, it appears—and this testimony is not controverted—that appellant's agent called appellee's attention to the last clause of the contract, as to which Mr. Thompson testified:

"Mr. Waterman called my attention to the last clause in the contract reading as follows: 'This proposal is submitted for prompt acceptance, and, unless so accepted, is subject to change without notice.' In answer to what Mr. Waterman said relative to that clause, I told him that it was late in the season and that we would have to have quick delivery; that we would have to have a definite answer immediately, if we were going to buy this filter. That was the sum and substance of it. He understood it was a rush order. I then signed that acceptance so called. I told him I would have to have a quick answer."

This testimony of the witness Thompson was admissible as an explanation of the ambiguity arising upon the face of the contract, that is, if the contract is, in fact, ambiguous, and it appears from Mr. Thompson's testimony that he understood, in making· the proposal, that appellee was to have notice of the acceptance of the contract, and that appellant's agent so understand the proposal that appellee was making.

4. This testimony of the witness Thompson does not, as insisted by appellant, vary the terms of the written proposal of appellee. If, by its terms, the proposal required

notification, Thompson's testimony was in complete harmony and constituted only a restatement of the written terms. But if the contract was ambiguous, then Thompson's testimony was admissible as an explanation and understanding of the conditions upon which the contract was, in fact, made.

[6] 5. The letter of February 14, reading:

"Conroe Gin, Ice & Light Co. Conroe, Texas—Gentlemen: Attention of Mr. Henry Thompson, Manager. This will acknowledge and thank you for your order given Mr. Waterman for a No. 2 Junior steel tank International softener and filter, for 110 volt, 60 cycle, single phase current, for shipment March 10th.

"Please make shipment of the sample of water promptly so that we may make the analysis and know the character of the water before shipment of the apparatus. Shipping tag is inclosed, and please note the instructions to pack to guard against freezing.

"Yours very truly,
"International Filter Co.
"M. B. Johnson"

—did not constitute an acceptance of appellee's proposal, nor a notification of the acceptance made by Mr. Engel in Chicago. Language of similar import has often been construed by the courts, and while there is a conflict in the decisions, quoting from the note to Krohn-Fechheimer v. Palmer, 282 Mo. 82, 221 S. W. 353, 10 A. L. R. 683, "the weight of authority seemingly is to the effect that the mere acknowledgment of a receipt of an order does not" constitute an acceptance.

In Courtney Shoe Company v. Curd & Son, 142 Ky. 219, 134 S. W. 146, 38 L. R. A. (N. S.) 903, a decision by the Supreme Court of Kentucky, a wholesaler wrote a retailer as follows:

"Your order of 8/21/09, to our Mr. Yater, is at hand and will receive our prompt and careful attention. Thanking you for same, and hoping to merit your future favors, we are, yours truly."

Later, the wholesaler rejected a part of the order, and, in the litigation which followed, the trial court submitted as an issue the intention of the wholesaler in sending the writing—that is, whether it was intended as an acceptance of the retailer's order. It was held to be error to submit such an issue, and that the writing, as a matter of law, does not constitute an acceptance.

In Manier v. Appling, 112 Ala. 663, 20 So. 978, the defendant acknowledged receipt of an order saying, "The same shall receive prompt attention." This was held not to be an acceptance.

The case of Krohn-Fechheimer· v. Palmer, 282 Mo. 82, 221 S. W. 353, 10 A. L. R. 678, is by the Supreme Court of Missouri. In that case an order had been sent into a wholesaler by its traveling salesman, and it

contained the words, "Order not subject to countermand." The proof showed that the order could not become effective until approved by the proper representative of plaintiff at its office. It was testified. "We sent to Palmer Dry Goods Company a postal card notifying them that their order had been received and would have our attention." The court said that this language would mean nothing more than a promise that its acceptance would be considered, and the court quoted with approval from 23 R. C. L. p. 1289:

"In the absence of a further showing of the intention of the parties, the better view seems to be that a letter acknowledging the receipt of an order coupled with the words 'the same shall have prompt attention' or 'prompt and careful attention' is not of itself an acceptance which will prevent a withdrawal of the order by the buyer or bind the seller to fill the order, though it may be evidence to be considered with other circumstances."

We think the construction we have given this letter is aided by the last clause, wherein appellant asks for a shipment of the sample of water. It was a part of appellee's proposal to submit a sample of water to be purified. Appellant was entitled to the privilege of analyzing this water before accepting the offer, and by requesting appellee to ship the sample there is no intimation that it was waiving any rights given it by the contract. There is in this last clause nothing more than a request from appellant to appellee to complete its proposal, and appellant,` in using language so closely in harmony with language so often construed by the courts, was not committing itself to a contract, nor was it notifying appellee of the secret acceptance by its president. We think appellee has correctly construed the proposal and the letter by its illustration, as follows:

"To illustrate, you say to me: 'I will buy, from you a filter for $1,230 to purify my water. Will you agree to sell it to me for said price?' "I answer: 'I thank you for the offer. Send me a sample of your water for analysis, sending it in this bottle which I hand you.' "Have I agreed to sell you a filter? The answer is obvious, and yet the negotiations, when analyzed, mean nothing more nor less than is shown in the illustration. Could it be seriously contended that my answer to your proposal bound me to do anything?"

It follows from what we have said that the trial court's judgment in favor of appellee must be affirmed, as the contract was never concluded by appellant.

Appellant has advanced many propositions attacking the trial court's conclusion that sufficient evidence was not offered by it to form a basis of a judgment in estimating its damages. In view of the conclusions announced, we see no advantage to appellant from a consideration of such propositions, as they in no wise militate against our conclusions upon which we are resting our judgment.

For the reasons given, the judgment of the trial court is in all things affirmed.