FIDELITY & DEPOSIT CO. v. AGNEW.

(Circuit Court of Appeals, Third Circuit. April 10, 1907.)

No. 31, March Term, 1906.

1. PRINCIPAL AND SURETY—WORKING CONTRACT—PAYMENTS ON ARCHITECT'S ESTIMATES—DISCHARGE OF SURETY.

The provision in a building or working contract that the contractor or builder shall be paid as the work progresses according to the amount of materials furnished or work performed, upon estimates to be made by the supervising architect or engineer, whether a percentage is to be retained therefrom until the whole is done or not, redounds to the benefit of a surety or guarantor of the party who is to fulfill the contract; and, upon payment being made in disregard of it, there is such a departure from the contract upon which the undertaking of the surety or guarantor is based that he is released.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 283–285.

2. SAME—ESTIMATES OF ARCHITECT—APPROVAL OF INVOICES.

Where, under an agreement to furnish material for the construction of a building, to be paid for in monthly installments, upon estimates made by the architect in charge of the work of the material on the ground delivered during the preceding month, of which 10 per cent. was to be retained until 30 days after all the material had been delivered and accepted, and satisfactory proof made that there were no liens, the only evidence as to such estimates was that the supervising architect approved the invoices on which the material was billed from the quarry, after going over them at the end of each month with the contractor of the building, or his representative, in a suit against the surety on the bond given to the contractor by the materialmen for the performance of their agreement, held, that the defendant was entitled to a verdict.

3. CONTRACTS—ESTIMATES BY ARCHITECT—REQUISITES OF.

Under such an agreement, the estimates to be made by the architect there provided for necessarily involved, not only an approximate judgment upon inspection by the architect or his representative of the quantity and value of the material delivered, having regard to its character as to which there may be a difference, but the relative value of it to the total quantity which had been contracted for.

4. PRINCIPAL AND SURETY—INEFFICIENCY OR MISTAKES OR ARCHITECT—FAILURE TO ACT—KNOWLEDGE OF—INFORMAL CERTIFICATES.

No doubt in such a case the builder to whom the material is to be furnished is not chargeable with the inefficiency or mistakes of the architect, provided an attempt at an estimate is really made; and, in the absence of notice to the contrary, an approval of the invoices may be sufficient for him to act upon, without a formal certificate, nothing being said about that in the agreement. But not only may the deficiencies be so gross as to put him on inquiry, but where to his certain knowledge the only basis for the architect's approval is the invoices on which the material was shipped and the representations made at the time by the builder himself or his representative, being thus fully advised as to how such approvals are obtained, they are only available to him for what they stand.

5. SAME—ADVANCE PAYMENTS—LOANS ON ACCOUNT OF MATERIAL TO BE DELIVERED.

Where, early in the performance of an agreement of the character specified, and when but little material had been delivered, the materialmen, needing money, applied to the builder for an advance, to be paid back by the shipment of material, and, the builder not being able to accommodate them himself, it was arranged that they should execute a note, which he indorsed and had discounted at the bank where he did business, the materialmen receiving the proceeds, and the understanding being that it

should be met by the shipment of material, no payment thereafter being made to the materialmen, but the value of the material shipped by them being accounted for to the bank by the builder and there credited, and the first loan which was paid being succeeded by others from time to time, all of which were finally met in this way, *held*, that the transaction could not be treated as merely an accommodation loan, to which the builder lent the security of his name, but that it constituted an advance of money upon the agreement, to be repaid by a delivery of material; the materialmen as the result having put into their hands a large sum in advance and anticipation of deliveries, in disregard of the agreement, depriving the surety of the protection and incentive of restricted payments to its prejudice, thereby releasing it from its undertaking.

6. SAME—AGREEMENT TO INDEMNIFY AND SAVE HARMLESS.

While, in a bond for the fulfillment by materialmen of an agreement to furnish certain material to one who was constructing a building, a provision to indemnify and save harmless from all damages in the premises may impose something more than the mere obligation to see to the fulfillment of the agreement so far as concerns the delivery of material, the obligation is none the less one of suretyship, imposing the reciprocal duty on the other party to not depart from it to the surety's detriment.

In Error to the Circuit Court of the United States for the District of New Jersey.

Norman Grey and John G. Johnson, for plaintiff in error.

John Harding, of Griggs & Harding, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD, District Judge.

ARCHBALD, District Judge. The provision in a building or working contract that the contractor or builder shall be paid as the work progresses according to the amount of materials furnished or work performed, upon estimates to be made by the supervising architect or engineer, whether a percentage is to be retained therefrom, until the whole is done or not, redounds to the benefit of a surety or guarantor of the party who is to fulfill the contract; and, upon payment being made in disregard of it, there is such a departure from the contract upon which the undertaking of the surety or guarantor is based that he is released. The purpose of such a stipulation is to guard against the consequences of a default, in case the principal contract proves a losing one, or the contracting party for any reason fails to comply, the percentage retained, where that is provided for, affording additional security, as well as holding out an incentive; and when it is not observed, and advance or overpayments are made, it is so obviously to the prejudice of the surety that it operates as a discharge as matter of law. Steam Navigation Co. v. Bolt, 6 Com. Bench N. S. 550; Calvert v. London Dock Co., 2 Keen, 639; Prairie State Bank v. U. S., 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 412; Shelton v. American Surety Co. (C. C.) 127 Fed. 736, affirmed 131 Fed. 210, 66 C. C. A. 94; Welch v. Hubschmitt, 61 N. J. Law, 57, 38 Atl. 824; Village of Chester v. Leonard, 37 Atl. 397, 68 Conn. 495; Fitzpatrick v. McAndrews, 12 Pa. Co. Ct. Rep. 353. This is too well established to be controverted, and the only question is how far it applies here.

The bond upon which suit is brought was given by the Avondale Marble Company, as principal, with the Fidelity & Deposit Company

of Maryland, as surety, to W. H. H. Van Houten, in the sum of $66,-000, for the faithful performance of an agreement entered into by the marble company, to furnish and deliver marble and granite for the new courthouse, in process of construction at Paterson, N. J., of which Mr. Van Houten was the contractor or builder. By the agreement referred to it was, among other things, stipulated that "the sum to be paid by the party of the second part [Van Houten] to the party of the first part [the marble company] for the said materials shall be one hundred and ten thousand dollars" (subject to deductions as therein provided), and that the said sum should be paid in current funds on or about the 5th day of each and every month, "upon estimates made by the architect in charge of said work, of the material on the ground, delivered during the preceding month," the marble company to be paid 90 per cent. of the amount of these estimates, and 30 days after the architect should have accepted all the material the retained 10 per cent. to be paid to the marble compa● upon its furnishing satisfactory evidence that no liens existed thereon. The marble and granite was to be delivered f. o. b. at the quarry, at Avondale, Chester county, Pa., and shipped to Van Houten, the contractor, with the cost of the freight from the quarry to the city of Paterson "to be allowed and deducted" by him from the contract price; and upon failure to deliver it, as required by the agreement, he was to be at liberty, upon five days' written notice, to supply the material and deduct the cost from the moneys due. The complaint of the surety is that, instead of adhering to the terms of the agreement and paying upon estimates of the architect as the work went on, no estimates, or at least none worthy of the name, were made, with the result that, with the knowledge of the contractor, payments were allowed which were greatly in excess of the material delivered; and, further, that, when but a fraction of the agreement had been performed, the marble company, needing money to conduct its operations, was favored with large advances to be met by future deliveries, this arrangement continuing down to the close of the transaction, the restrictions provided by the agreement being thereby virtually abrogated. Instructions appropriate to these issues were asked at the trial, and, in view of the undisputed evidence with regard to them, the request was made by the surety that a verdict be directed in its favor. This was refused, and, the case having been submitted to the jury, a verdict of some $40,000 was rendered against it, upon which the record is now brought here for review.

The question whether estimates were in fact made was for the jury under proper instructions, provided there was evidence upon which to predicate it. But, unfortunately, all that there was upon this subject was that Mr. Reed, the supervising architect, approved the invoices, on which the material was billed from the quarry by the marble company, after going over them at the end of each month with the contractor or his son, who had charge of this part of his father's business. This was clearly not a compliance with the agreement. An estimate such as is there spoken of necessarily involved, not only an approximate judgment, upon inspection by the architect or his representative,

of the quantity and value of the material delivered, having regard to its character, whether granite, marble, or carved marble, as to which there was a considerable difference, but the relative value of it to the total quantity which had been contracted for. And when it is considered that, out of a total contract price of $110,000, representing 82,000 weighed feet to be delivered, bills for some $105,000 were approved and paid, when but 60,000 weighed feet, having a relative value of but $73,000, had been furnished—an overpayment of $32,000—it is altogether too much to ask that the mere looking over of the invoices in the way described shall be accepted as in any sense constituting an estimate such as was contemplated. The prejudice of this to the surety is manifest, the overpayment made being substantially the amount above the contract price, which is now demanded, which, had it been kept back by the contractor as provided in the agreement, he would have had in hand enough to cover the material unfurnished, without calling upon the surety.

No doubt the contractor was not chargeable with the inefficiency or mistakes of the architect, provided an attempt at an estimate was really made; and, in the absence of notice to the contrary, an approval of the invoices may have been sufficient for him to act upon without a formal certificate, nothing being said about that in the agreement. But not only were the deficiencies in the deliveries so gross as to put him upon inquiry, but the only basis for the architect's approval, to his certain knowledge, being the invoices on which the material was shipped, and the representations made at the time by himself and his son, one or both, with regard to them, he was fully advised as to how the approvals were obtained, and just what they amounted to, and they are only available to him here, in consequence, for what they stand. That Mr. Van Houten was also aware, at least in a general way, from the outstart, of the discrepancy in deliveries, is shown by his letters—one of January 5, 1898, complaining that not a hundredth part of the material had been furnished, which would only have entitled the marble company to about $1,000, after deducting the percentage, although bills to the extent of $4,450 had been already approved and paid; and another of August 4th, declaring that not quite a quarter was on the ground, at which time $30,311 had been paid, as against $24,750 due, an advancement of some $5,000. It is not necessary to consider whether, even though no estimates were made, Mr. Van Houten would have been within the terms of the agreement and the surety have no cause to complain, if the payments for material delivered did not in fact exceed 90 per cent. of its relative value. The jury were so instructed, it is true, but the evidence was so overwhelmingly the other way, that, if the case turned upon that, a verdict for the defendant was inevitable, and should have been directed. But, passing that by, it could not be successfully contended, in view of what has been referred to, either that estimates were really made or that the contractor was without knowledge, and, relying upon the apparent action of the architect in approving invoices, was therefore protected. One or the other, however, was vital to be shown, and in the absence of it the surety was released by the overpayments made in disregard of

the agreement, and the verdict to the contrary cannot be sustained.

This disposes of the case; but it is further contended that, entirely aside from whether estimates were made, the delivery of material was anticipated by advances of money, equally in contravention of and prejudicial to the rights of the surety, which also operated to release it. The facts upon which this is based are as follows: In the spring of 1898, when comparatively little material had been delivered, the marble company being short of funds, Mr. Hepburn, the manager, went to Mr. Van Houten to see whether he could not get some money for the company, asking for a lump sum, to be paid back by the shipment of material. Mr. Van Houten was willing to accommodate him, but, not having the money himself, it was suggested that they should see whether it could not be obtained elsewhere. He and Mr. Hepburn and Mr. Shaw accordingly went to the Paterson National Bank, where Mr. Van Houton did business, and, after discussing the matter there with the cashier, it was arranged that the marble company should give its note, which Mr. Van Houten would indorse and the bank discount for him, the marble company receiving the proceeds. This was carried out, a two months' note for $10,000, bearing date May 10, 1898, being made and discounted, the proceeds being credited to Mr. Van Houten, who turned the money over to the marble company. This note was subsequently paid off, as arranged, with two months' shipments; no payments being made to the marble company on these deliveries, but the value of the material being turned into the bank by Mr. Van Houten and there credited. This first note came due in July, when another note of like amount at three months' time was given and discounted; the money on this occasion being turned over to the marble company direct, against which it made payment by deliveries of material as before, through August and September, the whole being taken care of in that way. Before the second note came due, however, still another was given and discounted, September 16th, for three months, also for $10,000, overlapping the other. This one came due December 16th, and certain payments were made on it by material as before, but not enough to fully meet it, by some $6,410, which being still unpaid at its maturity was renewed by a further note for that amount at three months' time, not however by the Avondale Marble Company, whose quarry had been sold out meantime by the sheriff, but by certain individual members, who succeeded that company and organized another—the Pennsylvania Marble & Granite Company— which took over the quarry and continued the delivery of material under the existing agreement. The last-named note came due in March, 1899, and was extended by another due in May, which was itself succeeded by still another for the increased sum of $10,000, on which $3,000 was paid July 14th; a renewal for the balance, made in August, being finally paid when it came due.

The learned trial judge was of the opinion that these note transactions were merely accommodation loans having no other significance; Mr. Van Houten simply lending the security of his name by indorsing the notes of the marble company and the parties who succeeded it, which with the several renewals and extensions the bank discounted for

them. But the case is not so simple; nor is the transaction able to be separated from the existing agreement between the parties with regard to the delivery of material. As already observed, the money obtained was obtained in direct response to an application by the marble company for an advance on account of the agreement and the delivery of material to be made under it, and by the arrangement which was made for its repayment it was expressly tied up to this. No doubt, as to the bank, it was a loan; but as to the others it was essentially an advance of money upon the agreement, to be repaid by a delivery of the material there contracted for. This also was the course pursued; the value of the material subsequently delivered being turned over to the bank by Mr. Van Houten, and the marble company credited accordingly, no payments on account of material being otherwise made so long as there were these outstanding notes. It is true that the 10 per cent. was still withheld from the amounts credited, but that does not help the matter. The point is that, instead of being paid as marble and granite were delivered, as provided in the agreement, the marble company had put in its hands by the transaction a large sum of money in advance and anticipation of this.. Thereafter it was not a question of payment according to deliveries, where the agreement puts it, but a repayment by deliveries outside of it. This deprived the surety of the protection and the incentive of restricted payments, and was just as prejudicial as if the advance were less disguised. The money so obtained not only helped to swell the grand total of overpayments made, but until material to correspond had been delivered, if this, indeed, was ever entirely the case, it carried these payments meanwhile by just so much more beyond bounds; the surety in either case being released by the plain departure from the terms of the agreement.

There are other questions which might require discussion, if the case were going back for a retrial, such as the deduction of freight bills before the calculation of the percentages to be withheld, instead of afterwards, and whether, upon a default by the marble company, the surety was liable to the extent contended for at the trial. But the case is to stop here, and it is not material. The point now made for the first time that the contract in the bond was something more than one of mere surety, the final clause of the condition being to indemnify and save harmless from all damages in the premises, is not only open to the objection that it was not raised in the court below and so its influence upon the disposition of the case cannot be determined; but there is no force to it, in our judgment, if it had been. It may have imposed on the surety, as argued, something more than the mere obligation to see to the fulfilment of the agreement so far as the delivery of material was concerned, but it none the less made the obligation one of suretyship, imposing the reciprocal duty on the opposite party of not departing from it to the detriment of the surety in respect of what is involved in this issue, as was clearly done.

The judgment is reversed.