FORT DODGE, DES MOINES & SOUTHERN RAILROAD COMPANY et al., Appellees, v. J. F. BURNS et al., Appellants.

PRINCIPAL AND SURETY: Release of Surety—Alterations. Evidence reviewed in an action on a surety bond guaranteeing the performance of a contract for the construction of an electric transmission line, and held that the changes and deviations from the specifications were such as were specifically authorized by the bond.

PRINCIPAL AND SURETY: Release of Surety—Excessive Payments—Advances by Way of Loans. Personal loans by the principal to the contractor in order to enable the contractor to carry on the contract, with agreement that such loans would be taken out of the ensuing estimate due the contractor, which was done, are not such an advance payment as will release the surety.

PRINCIPAL AND SURETY: Release of Surety—Performance of Additional Work by Contractor. No release of a surety results from the act of the principal in employing and paying the contractor to do work other and different from that covered by the bond, when such work was beneficial to the surety, in that it was necessary in order to enable the contractor to proceed with the bonded work.

PRINCIPAL AND SURETY: Liability of Surety—Adjudication in Absence of Contractor. The liability of a surety may be adjudicated as between the principal and surety, even though the contractor has not been brought into court, especially where a stipulation of fact contained by agreement "all the facts pertaining to the controversy."

PRINCIPAL AND SURETY: Liability of Surety—Surety for Consideration—Presumption. It will be presumed that a duly incorporated surety company, authorized to do business in this state, did not sign *as a mere accommodation* a bond for the performance of a contract.

*Appeal from Boone District Court.*—R. M. Wright, Judge.

Thursday, June 29, 1916.

This is an action by plaintiff against one Burns, a contractor, and the appellant, Southern Surety Company, which signed a bond in the sum of $2,000 with said contractor as surety. The case was tried to the court without a jury. The court found for plaintiff, and rendered judgment against the surety company for $2,000, the amount of the bond, with interest and costs. The surety company appeals.—*Affirmed.*

*C. H. E. Boardman* and *A. G. Moseley,* for appellants.

*Dyer, Jordan & Dyer,* for appellees.

Preston, J.—The case was tried entirely upon an agreed statement of facts. On the 26th day of July, 1912, the appellees, as receivers of the Fort Dodge, Des Moines & Southern Railroad Company, entered into a written contract with one J. F. Burns, by the terms of which Burns agreed to furnish the necessary labor for the construction of a high tension transmission line from Fraser, Iowa, to Fort Dodge, Iowa. On the same date, Burns and appellant, a surety company, executed a bond in the sum of $2,000, conditioned upon the faithful performance of said contract, and delivered such bond to the appellees. Burns commenced work under said contract about August 1, 1912, and continued until December 1, 1912, when he abandoned the work and disappeared, leaving the contract but partially completed. On December 3, 1912, the appellees duly notified appellant in writing of Burns'

1. PRINCIPAL AND SURETY: release of surety: alterations.

default and of the unfinished condition of the work, and demanded that the appellant complete the contract. The appellant notified the appellees on December 6, 1912, that it would not complete the work; thereupon, the appellees proceeded to complete the unfinished portion of said contract. After this work was finished, they demanded payment from the appellant of the amount due on the bond. The appellant refused to pay and this suit was commenced to enforce such payment.

There are three main points relied upon by appellant for a reversal, and these are set up in the answer and covered by the assignments of error. They are, substantially, that plaintiff failed to perform the conditions of its contract and the requirements of the bond, in that it paid to the contractor money before it was earned, when the contract required that he be paid only for work actually done, and that 10 per cent of that amount be retained; and that plaintiff engaged the contractor to perform work outside the contract, using the same men and commingling the accounts, when, as appellant claims, the contract and bond prohibited any such arrangement; and that this breach of the contract and change in the contractual relations of the parties operated as a release of the surety. There is a claim, also, that the contractor was not in court and no effort was made to serve him, and that, by reason of that fact, the appellant could not know what the real arrangements were as to advance payments and extras.

So much of the agreed statements of facts as appears to be necessary to a determination of the questions presented, in addition to parts already referred to, is as follows: After conceding that plaintiffs and defendants are officers and corporations, as alleged, and the execution of the contract and the bond, it was agreed:

"(5) The specifications and the blue prints referred to in the contract and the bond are herewith submitted, marked Exhibit 2, and are identified by the signatures of counsel.

"(6)    Said Burns commenced work under said contract about August 1, 1912.

"(7)    The work contemplated by said contract covered 30.2 miles, approximately.

"(8)    On August 24, 25, and 26, 1912, the plaintiff engaged Burns to replace certain poles blown down on the main line between Boxholm and Hope, same being work not covered by the written contract of July 26, 1912. For this work, Burns used his regular gang of men, and the plaintiff paid to Burns, on August 31, 1912, the sum of $178.96, which amount was the amount of time presented by Burns for his men on said date. The said poles were blown down by a storm, and it was impossible to operate trains for purpose of stringing wires or for Burns to go to and from his work, with the poles blown down. The poles blown down was work that Burns had nothing to do with, but were poles that carried the trolley wires.

"(9)    August 31, 1912, Burns had dug 220 holes for the poles, framed 250 poles, raised and fitted 175 poles and placed 40 ground wires, and had completed 80% of 7 miles of work which, at $120 per mile (80% of $840), would be $672. An estimate on that basis was made by plaintiff and 10% deducted ($672 less $67.20), and $604.80 was on that day paid J. F. Burns by plaintiff, the voucher or check paying said $604.80 being made payable to J. F. Burns & Company and endorsed by J. F. Burns & Company and J. F. Burns, same being paid August 31, 1912.

"(10)    On September 30, 1912, Burns had dug 565 holes for poles, framed 530 poles, set 350 poles, strung 9 miles wired (not tied in), and anchored 9 miles, and the plaintiff estimated said work as worth $1,433. Plaintiffs deducted from same the first estimate of (of August 31, 1912) $672, making $761. Deducted from this amount $76 and made the amount due Burns on this estimate $685. On September 30, 1912, the plaintiff paid Burns $1,000. No notice was given the South-

ern Surety Company of this payment. It was agreed at this time between plaintiff and Burns that this voucher for $1,000 was in the nature of a $315 loan on account of Burns' lack of funds and that same should be taken into account in the next estimate and to be deducted from the amount due Burns in the next estimate. The Southern Surety Company was no party to this arrangement between Burns and plaintiff.

"(11) Certain changes were made in the location of poles on Frazer Hill, and Burns and plaintiff agreed that Burns should be paid $72.20 for that extra labor, and same was included in the next payment. Certain changes were made in the poles at Lundgren, for which the plaintiff and Burns agreed he should have extra pay to the amount of $18.72, and same was included in the next payment.

"(12) On October 14, 1912, the said Burns being in need of funds, the plaintiff advanced to Burns the sum of $100, same being made prior to the making of the estimate for that month, Burns needing the money on account of men leaving him. It was a payment on work done, it being the agreement with Burns that said $100 was to be taken into account and deducted at the next estimate. The Southern Surety Company had no knowledge of this transaction.

"(13) October 31, 1912, Burns had dug 845 holes for poles, framed 830 poles, raised 531 poles, set 532 poles, set 375 guard arms and anchored 14 miles, and completed 2 miles up hill. Had wire from Wolf to Niles and had 9 miles strung in not tied. This work the plaintiff estimated at $2,561.35, and from that amount deducted first estimate ($604.80), second payment of $1,000, deducted $100 paid Burns October 14, 1912, (referred to in paragraph 12), leaving due Burns in this estimate $866.55, from which plaintiff deducted 10%, or $86.65, leaving $779.90 due on the contract. To this was added the $72.20 and $18.72 referred to in paragraph 11 above, and voucher was issued to Burns for $870.82, which, on November 1, 1912, was paid by the plaintiff. The figures on this transaction then being:

```
"Estimate of work done          $2,561.35
Paid on contract   $  604.80
  "     "      "       1,000.00
  "     "      "         100.00
                                   1,704.80.
                                 ─────────
                                 $  866.55
        10% retained                 86.65
                                 ─────────
                                 $  779.90
Changes $72.20 Frazer Hill
         18.72 Lundgren              90.92
                                 ─────────
     Paid Nov. 1, 1912.          $  870.82
```

"(14)   November 8, 1912, the said Burns being in need of funds, the plaintiff paid to Burns the sum of $100, same being made prior to any estimate, with the understanding that same should be taken into account and to be deducted at the fourth estimate. Of this payment, the Southern Surety Company had no knowledge.

"(15)   It was decided between Burns and plaintiff that through a certain swamp that the poles should be anchored with screw anchors, four on each pole, instead of being fastened with rock. It was further agreed that $105 would be paid to cover the extra labor in this regard. Of this arrangement, the Southern Surety Company had no knowledge. It was impossible to construct the work as provided in the contract, and under the arrangement made, the work was facilitated. To have used rock would have been more expensive and delayed the work.

"(16)   November 30, 1912, Burns had constructed 31 miles of holes framing, setting of poles and raising, 14 miles of anchors, 21 miles of copper complete, 10 miles of static complete, 17 miles of static strung, 24 miles of storm guys, 11 miles of ground rods complete, 16 miles of ground rods driven, 19 miles copper strung out, 2 miles of completed line,

2 miles of copper up, not pulled, making a total amount constructed as plaintiff estimated same at $3,086, from which plaintiff deducted 10% ($308.60), leaving $2,777.40, and from this deducted former payments of $2,484.70, leaving $292.70. To this was added the cost of changing 575 guard arms, ($86.25), changing poles at Roberts ($24), repair on poles at Niles ($3) and taking down arms at Lundgren ($20) and $105 for anchors in swamp (see paragraph 15), a total for extra labor of $238.25, and the figures then would be:

| | |
|---|---|
| "Estimate of work | $3,086.00 |
| 10% | 308.60 |
| | $2,777.40 |
| Less Payments | 2,484.70 |
| | 292.70 |
| Extra Labor | 238.25 |
| Amount paid to Burns Nov. 30, 1912. | $530.95 |

"(17) On November 30, 1912, the plaintiff had paid Burns the sum of $3,385.53, same being as follows:

| | | |
|---|---|---|
| "Paid on Contract | | $  604.80 |
| "  "  " | | 1,000.00 |
| "  "  " | | 100.00 |
| "  "  " | | 779.90 |
| "  "  " | | 100.00 |
| "  "  " | | 292.70 |
| Total | | $2,877.40 |
| Extra work | $178.96 | |
| "  " | 72.20 | |
| "  " | 18.72 | |
| "  " | 238.25 | |
| | | 508.13 |
| | | $3,385.53, |

leaving a balance due Burns, if his contract had been then completed, of $746.60.

"(23) During December, 1912, the plaintiff, in accordance with the authorization of the Southern Surety Company heretofore referred to, paid to laborers claiming liens against the plaintiff's property for this work, the sum of $661.28, and also paid to laborers for labor performed for Burns on work additional to the contract, extras, the sum of $238.25, making a total paid to said laborers in all of $899.53.

"(24) Plaintiff then proceeded to complete the unfinished portion of said contract with Burns, Exhibit 1, and paid out in order to do so the sum of $2,134.36, all of which was for labor.

"(26) Plaintiff admits the limit of recovery in this case is the sum of $2,000, the amount named in the bond, interest and costs.

"(27) The reason the two vouchers above named were made to J. F. Burns & Company was that Burns presented certain bills or estimates on letterheads of J. F. Burns & Company, and vouchers accordingly were issued by the plaintiff in that name. The name of J. F. Burns & Company was used only through inadvertence, and no other person had any interest in the contract save J. F. Burns, who alone secured and receipted for all the money paid by the plaintiffs prior to the time Burns defaulted."

The specifications which were made a part of the contract provided, among other things:

"These specifications with the attached prints are presumed to give the full information necessary for the proper construction of said line, but the omission from either or both of any requirement, such as is essential to the construction of a first class power line of the character proposed, will not relieve the contractor of fulfilling any such requirement."

1. The provision of the specifications and contract just referred to contemplates some deviation from the strict letter of the contract, although appellant contends that no departure

is permitted, and that the contract and specifications do not provide for any changes, additions or extras. Counsel seem to agree that, if there is any material change in the work which is not contemplated by the contract and which increases the risk to the surety and thus operates to his prejudice, such will release the surety. But it is appellees' contention that the surety is not released unless there is a substantially material modification of the contract, and that the surety's risk is increased to its prejudice; and in support of their proposition, they cite the following Iowa cases, among other authorities: *Bartlett & Kling v. Illinois Surety Co.,* 142 Iowa 538; *Getchell & Martin Lumber Co. v. Peterson & Sampson,* 124 Iowa 599; *Queal v. Stradley,* 117 Iowa 748; *Crossley v. Stanley,* 112 Iowa 24; *Stillman v. Wickham,* 106 Iowa 597.

We have examined the record, and are of opinion that there were no changes or alterations made not contemplated and covered by the contract.

Appellant's first contention is that, by a provision of the contract, there were to be monthly payments of amounts sufficient to cover the pay roll, but never to an amount in excess of 10 per cent of the work performed at such date; and the claim is that payments were not made in accordance with this, and that, therefore, plaintiff did not comply with or perform its part of the contract.

**2 PRINCIPAL AND SURETY: release of surety: excessive payments: advances by way of loans.**

The stipulated facts show that, on September 30, 1912, the contractor, Burns, had earned $685, and that on that date he was paid $1,000. On October 14, 1912, he was paid $100, and on November 8, 1912, he again received the sum of $100. From the agreed statement of facts, it appears that:

"It was agreed at this time between plaintiff and Burns that this voucher for $1,000 was in the nature of a $315 loan on account of Burns' lack of funds, and that same should be taken into account in the next estimate and to be deducted from the amount due Burns in the next estimate."

From this it appears that it was expressly agreed that this

was not a payment upon the contract, but that it was a personal loan from the appellees to the contractor. Evidently the contractor was at this time in some financial difficulty. The payment of $100 on October 14, 1912, was for the same reason. The stipulation shows that at this time the contractor needed the money because his men were leaving him. He was in the same situation on November 8, 1912, when he received another sum of $100. These payments were made in order to assist the contractor in proceeding with the work which he had contracted to do. He could not, of course, complete the contract if his employees left him; he called upon appellees for personal loans to tide him over; they were beneficial to him and for the benefit of the surety which was responsible for his undertaking. All these three loans were taken into account at the end of the month in which they were made, and deducted from the amount due the contractor for labor furnished up to such time. No prejudice could result to the surety because of these acts. The condition lasted only a few days, and, at the commencement of the next month, the relations between the contractor and the plaintiffs were just the same as were required by the provisions of the contract. Had these loans been refused, it is probably true that the contractor would have abandoned his work at once, and the surety would have been left to complete a contract upon which less work had been done.

Appellant cites cases to the effect that advance payments upon a contract will release the surety upon the contractor's bond. Other courts hold that a premature payment will not release the surety, where the security is not impaired or where the risks of the surety are not increased. Appellee cites, in support of this proposition, *St. John's College v. Ætna Indemnity Co.* (N. Y.), 94 N. E. 994; *Stephens v. Elver* (Wis.), 77 N. W. 737; *Robinson v. Hagenkamp* (Minn.), 53 N. W. 813; *Leghorn v. Nydell,* 39 Wash. 17 (80 Pac. 833); *Bateman Bros. v. Mapel,* 145 Cal. 241 (78 Pac. 734); *Hand Mfg. Co. v. Marks,* 36 Ore. 523 (59 Pac. 549).

*Getchell & Martin Lumber Co. v. Peterson,* 124 Iowa 599, has some bearing. The rule is there recognized that a breach of an agreement will not relieve a surety from its liability when no prejudice results and no damage is sustained. See, also, *Fitger Brewing Co. v. American Bonding Co.* (Minn.), 149 N. W. 539.

But we think it is unnecessary to pursue this subject of advance payments further, because, as stated, the stipulation as to the facts shows that it was a personal loan. As we understand counsel for appellant, they concede in argument that, if it was an independent loan, the surety is not discharged; because they say:

"An advance by the principal to the contractor may be construed as an independent loan, in which event the surety is not discharged."

But they contend that, if the so-called loan is to be repaid in, labor or materials, or other performance of the contract for which the bond is given, or if the loan is carried with and as a part of the one transaction, the advancement discharges the surety, and they cite to this point, among other cases, *First Nat. Bank v. Fidelity Co.* (Ala.), 5 L. R. A. (N. S.) 418. But in that case, it was stated that the contract was not complied with in the manner of payment or in the reservation of 10 per cent and that the transaction bears none of the earmarks of a separate, independent loan. In the instant case, it was conceded in the agreed statement that these advances were loans, and, as already stated, they were deducted at the end of the month in which the loans were made, and the 10 per cent reserved. Further cases cited by appellant on the proposition that there is a distinction between an advancement which is in fact a loan and an advancement which is an overpayment on the contract, are *Museum of Fine Arts v. American Bonding Co.* (Mass.), 97 N. E. 633; *Fidelity & Deposit Co. v. Agnew,* 152 Fed. 955.

2. Appellant's next contention is that the surety was discharged because the contractor furnished labor for some

so-called extra work. We have already quoted from the
specifications and contract sufficient to show,
we think, that they contemplate that there
might be some deviation. The first item of
which appellant complains is the payment of
$178.96, made to the contractor on August 31,
1912. This payment was made for extra work done by Burns'
men in replacing certain poles along the line of railroad
operated by the appellees. The railroad is operated by elec-
trical power, and these poles carried the trolley wire. The
poles had been blown down by a storm, thus blocking the
traffic upon the railroad. The contractor needed railroad
service in the construction of the work contracted by him,
and, until such service was again furnished and the traffic
upon the railroad restored, he could not have proceeded with
his work; his men would have left him, and the completion
of his contract would have been delayed. Rather than allow
his men to remain idle, he assisted the railroad company in
replacing these poles, and presented his bill in the amount
above stated. We are unable to see how the appellant could
be prejudiced by this. It would have been prejudiced if the
poles had not been replaced. Surely, it was to its advantage
to keep the contractor at work, in order that the contract
might be completed. Later, a smaller amount was paid for
the same reason. Another payment for extra work was the
sum of $105, paid to the contractor November 30, 1912. The
specifications provided that the poles should be anchored
with rock. The pole line passed through a swamp. When
the construction reached this place, it was found that it would
be impossible to construct the work as provided in the con-
tract, and it was determined that through this swamp 'the
poles should be fastened with screw anchors. The stipulated
facts recite that to have used rock would have been more
expensive and would have delayed the work.

Another item was allowed which was a necessity in the
proper construction of a first class transmission line, as pro-

3. PRINCIPAL AND SURETY: release of surety: performance of additional work by contractor.

vided by the contract and specifications. Nothing is shown to the contrary by appellant.

Appellant also contends at this point that the accounts for the additional work were commingled with the accounts for the contract work. But the stipulation shows that a separate and distinct account of all additional work was kept, and the figures are set out in detail in the stipulation, as are also the figures for the contract work. Aside from this, it is shown that the amount expended by the railroad company to finish the work which Burns contracted to do was $2,795.64. Appellees retained from money due Burns and held in their possession the required 10 per cent, which amounts to $308.60. Deducting this leaves $2,487.04, which is the net amount the appellees were damaged by the default of the contractor. This is in excess of the penalty of the bond. Under the record, we think it quite clear that the company is liable for the amount of the bond, and such was the judgment of the court.

3. Appellant also contends that the contractor was not in court and has not been served with notice. We do not understand appellant to contend that the surety may not be sued without notice upon the contractor. The point made is that, because he was not in court, appellant could not know what the real arrangements were as to advance payments and extras. But the facts were stipulated as to this and all other matters. The stipulation recites that it contains "all the facts pertaining to this controversy."

4. Lastly, appellant contends that it is not shown that the defendant surety company ever received any consideration or reward for signing the bond as surety in this case, and that, therefore, the ordinary rules of strict construction in favor of the surety do not apply. It is true that it is not shown whether a premium was paid to the surety company, but it is alleged in the petition and

*(4. PRINCIPAL AND SURETY: liability of surety: adjudication in absence of contractor.)*

*(5. PRINCIPAL AND SURETY: liability of surety: surety for consideration: presumption.)*

admitted in the agreed statement of facts that the Southern Surety Company is a corporation, with its principal place of business and general office in the city of St. Louis, being duly authorized by the secretary of the state of Iowa to transact business within the borders of the state of Iowa. The name of the company and the fact that it is incorporated under the laws of Oklahoma, with general offices in St. Louis, Missouri, and doing business in Iowa, afford some indication that it is a surety company, and that it did not sign the bond as a mere accommodation. If the appellant is engaged in the business of becoming surety for others, we think the presumption obtains that the premium has either been paid or that the contractor is liable therefor. The proposition is similar to that as to whether an insured person is in good standing, and the holdings have been that it is not necessary for plaintiff to allege and prove such fact, as that is a matter of defense, if it be claimed that the party is not in good standing. 11 Encyc. of Pl. and Pr. 413; 4 Encyc. of Pl. and Pr. 626; 4 Wigmore's Evidence, Secs. 2483, 2486; 29 Cyc. 223. However, in the view we have taken of the case, we think that it is not very material.

Our conclusion is that the court rightly determined the matter, and the judgment is therefore—*Affirmed.*

EVANS, C. J., DEEMER and LADD, JJ., concur.